# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

NATHANIEL WOODS,

      *Plaintiff*,

v.

JEFFERSON DUNN, in his official
capacity as Commissioner, Alabama
Department of Corrections,

CYNTHIA STEWART, in her official
capacity as Warden, Holman
Correctional Facility, and

STEVE MARSHALL, in his official
capacity as Attorney General, State of
Alabama,

      *Defendants.*

No. 2:20-cv-00058-ECM

## MOTION FOR A STAY OF EXECUTION

The State of Alabama has targeted Mr. Woods for execution over other death-row inmates simply because he did not participate in the process of selecting his execution method. The State purported to offer two methods—lethal injection and nitrogen hypoxia—but unfairly and unlawfully neglected to tell Mr. Woods the critical facts that (1) the State actually has not developed a protocol for nitrogen hypoxia and (2) that if he did not affirmatively pick the "option" of nitrogen hypoxia, he would be executed before inmates who did. Obviously, if the State had truthfully informed him of the consequences, Mr. Woods would not have opted for his immediate execution. The suppression of this crucial information, compounded by Defendants' failure to provide Mr. Woods' equal access to counsel during the critical window for electing a method of

1

execution, led to the State requesting an execution date in this case. This is precisely the kind of arbitrary, unfair and cruel process that should not be sanctioned.

Given the life interest at stake, the likelihood that Mr. Woods is entitled to relief, and the State's minimal interest in concealing information, this Court should maintain the status quo and stay Mr. Woods' execution to allow for resolution of his constitutional and state claims.

## I.  BACKGROUND

### A.  <u>Procedural History</u>

On October 2005, Mr. Woods was convicted of capital murder. His convictions and sentence were affirmed by the Alabama Court of Criminal Appeals and by the Alabama Supreme Court, and the United States Supreme Court denied certiorari.

Mr. Woods filed a Rule 32 petition for postconviction relief, which the circuit court summarily dismissed on December 1, 2010. The Alabama Court of Criminal Appeals affirmed the dismissal of Mr. Woods' Rule 32 petition, and the Alabama Supreme Court denied certiorari.

Mr. Woods then filed a petition for habeas corpus under 28 U.S.C. § 2254 in October 2016, which was denied in July 2018. He then moved in the Eleventh Circuit Court of Appeals for a certificate of appealability, which was denied in February 2019. The United States Supreme Court denied certiorari on October 7, 2019.

On October 29, 2019, the State moved the Alabama Supreme Court to set an execution date, specifically requesting that Mr. Woods be executed via lethal injection. Mr. Woods opposed the motion on December 5, 2019.

On January 23, 2020, Mr. Woods filed a complaint in this Court. Mr. Woods alleged that the named defendants—Cynthia Stewart (warden of Holman Correctional Facility), Jefferson Dunn (commissioner of the Alabama Department of Corrections), and Steve Marshall (state

attorney general)—violated his constitutional rights to due process and equal protection and to be free from cruel and unusual punishment. Mr. Woods also alleged the Defendants committed legal fraud and fraudulent suppression in violation of Alabama state law when they failed to disclose the material information that there was no nitrogen-hypoxia protocol in place during the June 2018 opt-in period. Finally, Mr. Woods alleged Defendant Marshall violated the Alabama Administrative Procedure Act by adopting a rule—the execution-scheduling policy—without complying with notice requirements.

On January 30, 2020—a week after Mr. Woods' filed his Complaint—the Alabama Supreme Court scheduled Mr. Woods' execution for March 5, 2020.

On February 6, 2020, Defendants filed with this Court a Motion to Dismiss, and in the Alternative, Motion for Summary Judgment.

On February 7, 2020, Mr. Woods petitioned the Alabama Supreme Court to temporarily stay his execution. The Alabama Supreme Court denied the petition on February 14, 2020.

On February 13, 2020, Mr. Woods filed with this Court his Opposition to Defendants' Motion to Dismiss and, in the Alternative, Motion for Summary Judgment. In this same pleading, Mr. Woods' cross-moved for summary judgment.

**B. Facts**

In previous filings to this Court, the Government does not dispute the below facts.

**1.** *The nitrogen-hypoxia opt-in process.*

Lethal injection is Alabama's default method of execution. Ala. Code § 15-18-82.1(a). On April 6, 2012, inmate Carey Dale Grayson sued the State of Alabama, alleging that the State's lethal-injection protocol (and the secrecy then surrounding it) violated his Eighth and Fourteenth Amendment rights. Other death-sentenced inmates eventually filed their own complaints, which

were consolidated in the U.S. District Court, Middle District of Alabama, as *In Re: Alabama Lethal Injection Protocol Litigation,* Case No. 12-cv-00316 (M.D. Ala.). In that litigation, plaintiffs proposed nitrogen gas as an alternative method of execution.

While *In Re: Alabama Lethal Injection Protocol Litigation* was pending, on June 1, 2018, the State of Alabama amended its laws to allow death-sentenced inmates to choose the manner by which they would be executed: by Alabama's default method of lethal injection or by nitrogen hypoxia. *See* 2018 Alabama Laws Act 2018-353 (S.B. 272). Inmates whose death sentences had become final prior to the amendment's enactment, like Mr. Woods, were given 30 days to make this election. Ala. Code § 15-18-82.1(b)(2). After June 30, 2018, inmates who did not opt into death by nitrogen hypoxia would be deemed to have forever waived their right to make such election. *Id.*

At the time of the amendment's enactment and throughout the 30-day election period, the State of Alabama had not created or implemented a protocol by which it could carry out executions using nitrogen hypoxia. *See Price v. Commissioner, Dep't of Corrs.,* 920 F.3d 1317, 1327 (11th Cir. 2019) (noting Attorney General's disclosure that, as of April 2019, "ADOC ha[d] not yet finalized a nitrogen-hypoxia protocol"). State officials—such as the named Defendants in Mr. Woods' complaint—were aware of this. And they were aware of the consequences of it: no executions via nitrogen hypoxia would take place until a protocol was adopted. However, they did not share this information with inmates on death row, including Mr. Woods, during the 30-day election period.

As a result of the amendment to Alabama Code § 15-18-82.1, the parties to the *In Re: Alabama Lethal Injection Protocol Litigation* began to discuss whether the plaintiffs' claims were moot now that Alabama purported to provide for an alternative means for execution. The plaintiffs

in the consolidated litigation were concerned that they would not have adequate time to seek the advice of their counsel and to make a knowing and voluntary decision to elect death by nitrogen hypoxia before the June 30, 2018 deadline. These concerns were due, in part, to the lengthy delays in scheduling attorney-client meetings for death-sentenced inmates at the Holman Correctional Facility. The State and district court then facilitated meetings between the plaintiffs and their attorneys so that the plaintiffs could meet the June 30, 2018 deadline. *See* Melissa Brown, "In 2018, Alabama approved death by nitrogen for executions. When did it inform its inmates?", Montgomery Advertiser (June 25, 2019) (accessible at https://www.montgomeryadvertiser.com/ story/news/crime/2019/06/25/alabama-says-didnt-have-inform-its-inmate-new-execution- method/1276330001/). Because he was not a party to the *In Re: Alabama Lethal Injection Protocol Litigation,* Mr. Woods was not afforded this same opportunity.

After conferring with their attorneys, plaintiffs in the *In Re: Alabama Lethal Injection Protocol Litigation* case elected death by nitrogen hypoxia, providing written notice of same to the wardens of their respective correctional facilities before June 30, 2018. In total, approximately 50 inmates opted into nitrogen gas. After the plaintiffs made their election, the parties to the consolidated litigation jointly moved to dismiss the complaint for mootness. The joint motion to dismiss was filed on July 10, 2018. The district court granted the motion the next day, dismissing the complaint without prejudice.

Mr. Woods, not having the benefit of judicial intervention or of the unannounced relaxation of prison rules, did not have the opportunity to obtain the advice of his attorney before the June 30, 2018 deadline expired. Instead, he—like other death-sentenced inmates at Holman Correctional Facility—was simply provided a form by the warden and her staff. The form consisted of the following:

**ELECTION TO BE EXECUTED BY NITROGEN HYPOXIA**

Pursuant to Act No. 2018-353, if I am to be executed, I elect that it be by nitrogen hypoxia rather than by lethal injection. This election is not intended to affect the status of any challenge(s) (current or future) to my conviction(s) or sentence(s), nor waive my right to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia. Dated this _____ day of June, 2018.

_____          _____
Name/Inmate Number                       Signature

The Federal Public Defender's Office for the Middle District of Alabama created this form and distributed it to *its* death-sentenced clients. In conjunction with providing them the form, attorneys at the Federal Defender discussed the entire process with their clients. The warden of the Holman Correctional Facility, having seen the form, unilaterally decided to copy it, distribute it to every death-sentenced inmate a few days before the June 30, 2018, deadline, and gave them just a few hours to submit it.  Mr. Woods did not return the form at that juncture.

 **2.**      *Post-amendment executions in Alabama.*

Since June 30, 2018, eighteen (18) Alabama death-sentenced inmates have completed federal habeas review.  The State has moved to execute five inmates since that time, believing all of them were scheduled to die by lethal injection: Domineque Ray, Michael Brandon Samra, Christopher Lee Price, Jarrod Taylor, and Nathaniel Woods.

<u>Domineque Ray</u>

Domineque Ray was executed on February 7, 2019 via lethal injection.

<u>Michael Brandon Samra</u>

Michael Brandon Samra was executed on May 16, 2019 via lethal injection.

<u>Christopher Lee Price</u>

Christopher Lee Price desired to be executed via nitrogen hypoxia.  On January 27, 2019—more than a month before the Alabama Supreme Court scheduled the execution—Mr. Price wrote

a letter to the warden of Holman Correctional Facility, asking to be executed by nitrogen hypoxia. *Price*, 920 F.3d at 1322. The warden claimed to "not have the authority to grant, deny, or reject the request," and instead referred Mr. Price and his counsel to the State Attorney General. *Id.* The Attorney General ultimately denied Mr. Price's request, "citing the thirty-day period to opt into the protocol." *Id.*

On February 8, 2019, Mr. Price sued the State in U.S. District Court, raising various constitutional objections to the State's refusal to allow him to die by nitrogen hypoxia. During the litigation of Mr. Price's lawsuit, the State admitted that it did not have a protocol or the means by which to execute individuals via nitrogen hypoxia. *Id.* at 1327. Until that point, the State had not definitively disclosed whether it had an execution protocol for nitrogen hypoxia. *See* Brian Lyman, Montgomery Advertiser, "With nitrogen bill, Alabama must invest execution method," Nov. 12, 2018, accessible at https://www.montgomeryadvertiser.com/story/news/politics/elections/2018/11/23/nitrogen-bill-alabama-must-invent-execution-method/2004586002/ (noting that ADOC "said in a statement it was 'continuing to develop the protocol' with the Alabama Attorney General's Office for carrying out such executions"). Mr. Price's lawsuit eventually was dismissed.

Mr. Price was executed on May 30, 2019 via lethal injection.

### *Jarrod Taylor*

On July 29, 2019, the State moved the Alabama Supreme Court to schedule Jarrod Taylor's execution. As part of the motion, the State represented that Mr. Taylor had not made a timely election of death by nitrogen hypoxia. On July 30, 2019, Mr. Taylor's counsel informed the State that Mr. Taylor had, in fact, timely elected death by nitrogen hypoxia. A day later, Mr. Taylor's counsel provided the State documentation showing Mr. Taylor's timely election. On August 2, 2019, the State moved to withdraw the motion to set Mr. Taylor's execution date. In support of

the motion to withdraw, the State affirmed that "ADOC is not yet prepared to proceed with an execution by nitrogen hypoxia[.]"

### 3. *Current status of Alabama's Nitrogen-Hypoxia Protocol.*

While the State disclosed in April 2019 that it had not yet created or implemented a protocol or acquired the means to execute Alabama inmates via nitrogen hypoxia, it could have done so at any point in time leading up to the date it moved to sentence Mr. Woods' execution. As a consequence of the State's failure to adopt a protocol, it has indefinitely suspended and postponed the execution of all inmates who elected death by nitrogen hypoxia. To date, no state, including Alabama, has carried out an execution via nitrogen hypoxia.

## II. LAW & ANALYSIS

In moving for a stay, Mr. Woods seeks only to preserve the status quo while he litigates his constitutional claims. For the reasons detailed below, because Defendants suppressed information critical to Mr. Woods making a knowing and voluntary election decision, he is likely to prevail on the merits. Second, absent relief, he is likely to suffer irreparable harm—namely, execution. Third, a stay would not substantially injure Defendants because it was fully prepared to delay execution of anyone who elected nitrogen gas and, as Defendants assert, Mr. Woods could have opted for nitrogen gas. Finally, the public interest counsels in favor of a stay, as doing so would allow the Court to accurately resolve Mr. Woods' important and timely constitutional challenges concerning Defendants' discriminatory execution practices while having minimal, if any, impact on the Defendants' interests given that it was prepared to delay all executions. Accordingly, this Court should grant the stay until the merits of this action may be fairly determined.

A. **The Legal Standard**

A court may grant a stay of execution if the plaintiff "establishes that (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; *and* (4) if issued, the injunction would not be adverse to the public interest." *E.g.*, *Price*, 920 F.3d at 1323 (citations and internal quotation omitted) (emphasis in original). The Supreme Court has explained that "[a] stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (citations omitted). Despite these interests and the relatively high burden a plaintiff must meet, the Supreme Court has recognized that the equities can tilt in favor of staying an execution. *See*, e.g., *Bucklew v. Precythe*, 587 U.S. ____, 139 S. Ct. 1112, 1118 (2019) (noting the inmate "received a stay of execution and five years to pursue the argument" that Missouri's lethal-injection protocol was unconstitutional as applied to him). This is one such case.

B. **Mr. Woods is likely to succeed on the merits of his Complaint.**

1. *Defendants violated Mr. Woods' Fourteenth Amendment right to due process.*

The Fourteenth Amendment forbids the state from "depriv[ing] any person of life, liberty, or property without due process of law …." Here, Defendants intend to deprive Mr. Woods of his life and, in the process, forced upon him an obligation to choose the manner of his death. In the capital-punishment arena, the Government's obligation to provide due process is all the more critical. Indeed, the Supreme Court has emphasized its "heightened concern for fairness and accuracy" when reviewing "the process requisite to the taking of a human life." *Ford v. Wainwright*, 477 U.S. 399, 414 (1986).

As detailed in Mr. Woods' Motion for Summary Judgment, how much process is due depends on the situation. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). In assessing the Government's due-process obligations, this Court must analyze three distinct factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (citation omitted). As detailed in Mr. Woods' Motion for Summary Judgment, these factors all weigh in favor of Mr. Woods—and therefore weigh in favor of granting a stay of his execution.

***Private Interest Affected by Official Action.*** Asked to make a critical life decision, Mr. Woods had an interest in understanding all critical factors bearing on that decision. Defendants suppressed critical information bearing upon the timing of his execution. Defendants' wrongful withholding of this information negatively affected at least three of Mr. Woods' private interests: his fundamental interest in his own life; his Eighth Amendment right to be free from an excruciating death; and his interest in knowingly and voluntarily exercising his right—afforded by state law—to choose the manner of his execution.

Despite having been sentenced to death, Mr. Woods still has a "residual life interest." *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 281 (1998) (Rehnquist, C.J., joined by Scalia, Kennedy, and Thomas, JJ.) ("We agree that respondent maintains a residual life interest, e.g., in not being summarily executed by prison guards."); *id*. at 288 (O'Connor, J., joined by Souter, Ginsburg, and Breyer, JJ.) ("A prisoner under a death sentence remains a living person and

consequently has an interest in his life."); *id.* at 291 (Stevens, J., concurring in part and dissenting in part) ("There is, however, no room for legitimate debate about whether a living person has a constitutionally protected interest in life. He obviously does."). Indeed, in *Woodard*, the plurality explained that a death-sentenced inmate has a protected life or liberty interest in a purely discretionary clemency proceeding. Clemency proceedings, the plurality concluded, must incorporate "some *minimal* procedural safeguards," like notice of the clemency hearing and an opportunity to participate in the interview, for the proceeding to comport[] with Due Process. *Id.* at 290 (emphasis in original).

In contrast to the limited due process afforded the *Woodard* respondent as part of a purely discretionary clemency scheme, Mr. Woods was deprived of even minimal procedural safeguards during the 30-day period he was required to choose how Defendants would execute him. He was entitled to all relevant information bearing upon his choice, including that the State did not have a nitrogen-hypoxia protocol in place. And he was entitled to attorney access to assist in making an informed decision, which would allow him to understand the implications of any decision (or indecision). But Defendants did not tell him this nor give him equal access to counsel.

In fact, Defendants actively *withheld* this information from Mr. Woods. On June 26 or 27—just days before Mr. Woods was required to make his choice—Defendants distributed a form devoid of any information about the State's lack of a nitrogen-hypoxia protocol or the impact that not opting into death by nitrogen would have on his interests in *living* and avoiding painful death. Compounding this constitutionally deficient notice, Defendants told Mr. Woods that he had only a few hours before he needed to return the form—effectively guaranteeing that he would not have enough time to consult with his attorney. Defendants' troubling actions deprived Mr. Woods of his constitutional right to notice, "at a meaningful time and in a meaningful manner." *See Hamdi*

*v. Rumsfeld*, 542 U.S. 507, 533 (2004) (citation and internal quotations omitted); *Sessions v. Dimaya*, 584 U.S. ___, 138 S.Ct. 1204, 1225 (2018) (Gorsuch, J., concurring) ("Perhaps the most basic of due process's customary protections is the demand for fair notice.") (citations omitted).

In other filings in this case, Defendants have claimed they did not violate Mr. Woods' due process rights because they did not *prevent* him from contacting his attorney during the election period—and Mr. Woods anticipates Defendants will make the same argument here. But the relevant inquiry is not whether Defendants *prevented* Mr. Woods from obtaining his counsel's advice during June 2018; it is whether Defendants gave him the same opportunities to meet with his attorney as did they did other inmates. The undisputed facts answer this question in the negative. Specifically, Defendants do not dispute that: (1) they distributed to Mr. Woods a form that failed to supply critical information regarding the availability of nitrogen gas; (2) they distributed this form on June 26; (3) it is difficult for attorneys to meet with clients incarcerated on death row at Holman Correctional Facility; (4) because of these difficulties, Defendants facilitated meetings between attorneys from the Federal Public Defender's Office and their clients; and (5) the overwhelming majority of the 48 inmates who opted into nitrogen gas are represented by attorneys from the Federal Public Defender's Office. Defendants ignore these facts and say Mr. Woods received due process because they did not block him from contacting his attorney. This is belied, of course, by Defendants' own actions: if Defendants truly believed that all that was due Mr. Woods and his fellow death-row inmates was to ensure the phones were working in June 2018, then they would not have facilitated in-person consults for attorneys from the Federal Public Defender's Office (bending Holman's visitation rules in the process) or distributed a form to all inmates that *partially* informed them of their right to opt into nitrogen gas.

***Risk of Erroneous Deprivation.***  The second *Mathews* factor also weighs heavily in favor of Mr. Woods.  Defendants deprived Mr. Woods of vital information necessary to make a knowing and informed decision surrounding his execution.  Without this information, Mr. Woods understood that he was being given a choice between lethal injection and nitrogen hypoxia but did not understand that his election (or non-election) would impact the timing of his execution. Without this information, Mr. Woods declined to participate in his own execution process.  It was not until many months later that the State acknowledged it had no execution protocol for nitrogen gas and that the absence of a nitrogen-hypoxia protocol meant an indefinite stay for inmates who had opted into that method.

To prevent the risk that inmates like Mr. Woods would make uninformed decisions, Defendants should have disclosed—during the 30-day opt-in period—that there was no nitrogen-hypoxia protocol in place.  In addition, the State could have afforded inmates more than just 30 days to make such an important decision, thereby helping ensure inmates had enough time to consult with their counsel—many of whom are out-of-state and have difficulty reaching their clients at the Holman Correctional Facility.

***Government Interest.***  While the State has an interest in the enforcement of its criminal judgments and sentences, *e.g.*, *Hill*, 547 U.S. at 584 ("Both the State and the victims of crime have an important interest in the timely enforcement of a sentence" and the State has a "strong interest in enforcing its criminal judgments without undue interference from the federal courts.") (citations omitted), none of the procedural safeguards that Mr. Woods requests would meaningfully undermine that interest because they are not unduly burdensome or prejudicial to the State's interest.  Mr. Woods seeks only an election process wherein (1) all relevant information is provided and (2) he is afforded an opportunity to meaningfully consult with counsel—a process that

Defendants previously made available for individuals represented by the Federal Defenders in *In Re: Alabama Lethal Injection Protocol Litigation.*

Moreover, the State's timing interest is offset by Defendants' own conduct. That is, the very need for the delay is due to Defendants' suppression of information. Had Defendants provided this information in the first instance, Mr. Woods would not be advancing this claim and there would be no reason for delay. *See*, *e.g.*, *Landrigan v. Brewer*, No. 10-02246, 2010 WL 4269559, at *9 (D. Ariz. Oct. 25, 2010) ("Defendants have never adequately explained their rationale for withholding all evidence regarding the drug, and Defendants have now created a situation where a seemingly simple claim that could have been resolved well in advance of the execution must be resolved in five days—and now only eighteen hours dur to further protractions created only be [sic] Defendants—without the benefit of Plaintiff having the opportunity to present fact-based arguments"), *aff'd*, 625 F.3d 1144 (9th Cir. 2010), *rev'd on other grounds*, 131 S.Ct. 455 (2010)).

Finally, the State's proclaimed interest in swift executions is mitigated by the fact that it accepted a certain amount of delay as the inevitable consequence of adopting nitrogen hypoxia. The State was aware when it passed Ala. Code § 15-18-82.1—and gave every death-sentenced inmate the option of nitrogen hypoxia—that it did not have an execution protocol for that method and thus would be unable to perform executions until it did. The State should not then be heard to complain about a slight delay.

2.    ***The State's plan to execute Mr. Woods via lethal injection will violate his Eighth Amendment right to be free from cruel and unusual punishment.***

The Eighth Amendment prohibits arbitrary and capricious infliction of the death penalty. Mr. Woods is likely to demonstrate his Eighth Amendment rights will be violated, first, by targeting him for speedier execution based on his refusal to participate in the election process and,

second, by subjecting him to execution via lethal injection when there is now evidence that nitrogen hypoxia would be substantially less painful.

**Targeting for Execution.** At its core, the Eighth Amendment prohibits the wanton, freakish, and discriminatory infliction of the death penalty. As the Supreme Court has explained, the death penalty should not be deployed in "circumstances under which" it will be "meted out arbitrarily or capriciously or through whim or mistake." *Caldwell v. Mississippi*, 472 U.S. 320, 343 (1983) (O'Connor, J., concurring in part and concurring in the judgment) (citation and internal quotations omitted) (grammatical alterations omitted). Here, the State has singled out for execution those individuals who declined to participate in the process of choosing their own deaths. Such targeting is not simply arbitrary and freakish, it is affirmatively discriminatory and serves to punish individuals based on factors divorced from their offense. *Furman v. Georgia*, 408 U.S. 238, 249 (1972) ("A penalty … should be considered 'unusually' imposed if it is administered arbitrarily or discriminatorily."). This impermissible targeting, particularly when a consequence of withheld information, is cruel and unusual.

**Needless Suffering.** Since the time that the State forced Mr. Woods to make an election, new information has emerged concerning Alabama's methods of execution that demonstrates the unlawfulness of lethal injection under the Eighth Amendment and would have altered Mr. Woods' decisionmaking. The Supreme Court has adopted a two-prong analysis for assessing Eighth Amendment challenges based on the method of execution: (1) the inmate must show that the State's method creates a substantial risk of needless suffering, and (2) there is an alternative method that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. ___, 135 S.Ct. 2726, 2737 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 52 (2008)). Mr. Woods is likely to satisfy both showings.

As to the first, the same information and evidence the plaintiff relied upon in *Price*, 920 F.3d 1317—and the Eleventh Circuit found satisfactory—counsels in favor of the same conclusion here. *Id.* (citing district court's decision in *In re Ohio Execution Protocol Litigation*, No. 11-cv-1016, 2019 WL 244488, at *70 (S.D. Ohio Jan. 14, 2019) and expert report of Dr. David Lubarsky). As was demonstrated there, midazolam will not provide adequate analgesic effects and, as the Ohio court found, "will certainly or very likely cause [an inmate] severe pain and needless suffering. *Id.*

As to the second prong, because Ala. Code § 15-18.82.1 includes nitrogen hypoxia as a possible method of execution, "nitrogen hypoxia is an available alternative method of execution that is feasible and readily implemented." *Price*, 920 F.3d at 1326; *see also Price v. Dunn*, No. 19-cv-57, Dkt. 49 at 10 (S.D. Ala. April 11, 2019) ("according to the Eleventh Circuit, Price's reliance on nitrogen hypoxia as a method of execution—by 'pointing to' Alabama's official adopting of that method (the statute) demonstrates that the method is 'feasible and readily implemented'"). It does not matter that Defendants cannot currently carry out executions via nitrogen gas. *See Price*, 920 F.3d at 1328 ("[B]ecause the State voluntarily included nitrogen hypoxia in its statute, we reject the State's argument that nitrogen hypoxia is not 'available' to Price simply because the State has not yet developed a protocol to administer this method of execution."). Likewise, the fact that Mr. Woods did not voluntarily, knowingly, and intelligently choose to be executed via nitrogen gas during the State's 30-day window "does not somehow render [nitrogen hypoxia] 'unavailable'" to Mr. Woods. *See id.*

The only question, therefore, is whether Mr. Woods is likely to succeed in showing that nitrogen hypoxia significantly reduces a substantial risk of pain. *See Glossip*, 135 S.Ct. at 2737. The district court in *Price* answered that question in the affirmative, citing a study detailing the

benefits of nitrogen-induced hypoxia: "this … evidence shows that execution via nitrogen hypoxia will result in a significant reduction in the risk of severe pain." *Price*, No. 19-cv-57, Dkt. # 49 at 12. The only reason Mr. Price's execution was permitted to proceed was because he submitted a *draft* form of the relevant report. *See Dunn v. Price*, 139 S. Ct. 1312, 1313-14 (Brennan, J., dissenting) (noting that the draft report was mistakenly filed by Price's counsel). The final report, when submitted, was deemed sufficient, but the Supreme Court found jurisdictional barriers existed that precluded its consideration. *See Price v. Dunn*, 139 S. Ct. 1533, 1537 (2019) (Thomas, J., concurring) ("[T]he District Court abused its discretion in granting a preliminary injunction because it manifestly lacked jurisdiction over the case, which was pending in the Court of Appeals."). No such barrier exists here. The final report, which Mr. Woods will submit, makes clear that nitrogen hypoxia is painless—in stark contrast to the substantial risk of severe pain caused by lethal injection. There is thus a substantial likelihood that Mr. Woods will succeed.

* * *

It is cruel and unusual to insist on subjecting Mr. Woods to a method of execution known to have a significant risk of causing severe pain while denying him an available method of painless death. The punishment is even more cruel and unusual when the State's use of it results from Defendants' wrongfully withholding from Mr. Woods the very information he needed to choose painless death during an arbitrary 30-day period. *Cf. Price v. Dunn*, 139 S.Ct. at 1315 (Breyer, J., dissenting) ("To proceed in this way calls into question the basic principles of fairness that should underlie our criminal justice system.").

3.      ***Defendants are treating Mr. Woods differently than similarly situated inmates, in violation of his right to equal protection.***

There is a substantial likelihood that Mr. Woods will prevail on his claim that Defendants' actions denied him equal protection under the law. To prevail, Mr. Woods must show that "the

State will treat him disparately from other similarly situated persons," and "that the disparate treatment is not rationally related to a legitimate government interest." *Price*, 920 F.3d at 1323 (citations and internal quotation omitted).

*Disparate Treatment.* Mr. Woods is similarly situated in all meaningful respects to the 17 other death-row inmates who are eligible to be executed due to the completion of their direct appeals and federal habeas proceedings. However, the State has created two classes of death-sentenced inmates: (1) those whose executions have been indefinitely suspended because they elected, during a 30-day window, a method the State is not prepared to carry out, and (2) those whose executions will proceed because they did not elect to die via nitrogen hypoxia. Mr. Woods falls into the latter category (a consequence of Defendants' suppression) and, as such, has been targeted for execution sooner than similarly situated death-sentenced prisoners solely as a function of his method of execution. This is an unconstitutional distinction. *See, e.g., Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942) ("When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment.").

Defendants have argued in other filings to this Court that Mr. Woods is *not* similarly situated to 14 of these inmates because, unlike them, he did not choose nitrogen hypoxia during the June 2018 election period. *See, e.g.*, Dkt. 25 at 11 ("Woods is not similarly situated to the electing inmates because, in accordance with state statute, they have chosen to be executed by hypoxia"). Defendants do not dispute that in virtually every material aspect Mr. Woods is similarly situated to other death-row inmates who have exhausted their federal habeas petitions. Instead, they claim the very feature that Mr. Woods identifies as resulting in discriminatory conduct

supplies a basis for discriminating among them. This circular logic cannot stand. Defendants cannot create an unconstitutional distinction and then claim that distinction is what makes inmates different from each other. *See Skinner*, 316 U.S. at 541.

Furthermore, Mr. Woods also has been treated differently than the plaintiffs involved in the *In Re: Alabama Lethal Injection Protocol Litigation* case. Critically, Defendants do not dispute that they made exceptions to their own rules and allowed attorneys from the Federal Public Defender's Office to meet with their clients *as a group*. This was done to facilitate the legal advice that Defendants implicitly recognized would be necessary for an inmate to at least approach making an informed decision regarding method of execution prior to the June 30, 2018 deadline. The same opportunity, however, was not afforded to inmates like Mr. Woods, who were not represented by the Federal Public Defender's Office.

Mr. Woods is in the same untenable situation as nearly every other death-sentenced inmate who did not have the benefit of Defendants' disparate treatment. While he was represented by counsel in June 2018, Mr. Woods (and his attorney) could not have known that the State had no way to carry out executions using nitrogen gas, because Defendants deliberately withheld this information.

**Degree of Scrutiny.** Numerous fundamental rights are at issue here, including Mr. Woods' Fourteenth Amendment rights to life and notice as well as his Eighth Amendment to be free from cruel and unusual punishment. Accordingly, strict scrutiny applies. *See, e.g.*, *Furman*, 408 U.S. at 359 n.141 (1972) (Marshall, J., concurring) ("[B]ecause capital punishment deprives an individual of a fundamental right (i.e., the right to life), the State needs a compelling interest to justify it."); *Skinner*, 316 U.S. at 541 (recognizing strict scrutiny applies where the right at issue is "fundamental to [an individual's] very existence and survival" and he would "forever [be] deprived

of a basic liberty").  To survive strict scrutiny, the State must supply a compelling government interest in withholding information from inmates and targeting for execution those who declined to participate in the election process.  *See id*.  There is no compelling reason—or even a rational basis—for withholding such information or targeting.  Nor have Defendants ever articulated one.  In fact, by virtue of passing Alabama Code § 15-18.82.1, the State was fully prepared for delay, as all death-sentenced inmates had the ability to opt for nitrogen hypoxia.  As such, it cannot claim urgency as an interest that warrants depriving an individual of the opportunity to make an informed decision or hasten painful executions.  Nor does the State have any interest in facilitating attorney visits for one set of inmates while not doing the same for another.  As such, Defendants cannot demonstrate a rational basis, much less a compelling interest, for discriminating against Mr. Woods, much less a compelling basis.

      **4.**      *Mr. Woods is likely to succeed on his state-law claims.*

Mr. Woods is likely to prevail on his claims that the named defendants violated Alabama state law by (1) fraudulently misrepresenting material facts, (2) fraudulently suppressing material facts, and (3) failing to comply with the notice requirements mandated by the Alabama Administrative Procedure Act.

**Fraudulent Misrepresentation.**    To make out a claim of fraudulent misrepresentation under Alabama law, a party must demonstrate (1) a false representation, (2) concerning a material fact, (3) upon which the plaintiff relied, (4) resulting in injury to the plaintiff.  *See Int'l Resorts, Inc. v. Lambert*, 350 So. 2d 391, 394 (Ala. 1977).  All four elements are met here.

Defendants wrongfully withheld from Mr. Woods information about the impact of not opting into nitrogen hypoxia during the 30-day election period.  When they provided Mr. Woods the bare-bones and constitutionally infirm election form just days before the deadline, Defendants

effectively represented to Mr. Woods that he was making a decision regarding his preferred method of execution. But they failed to inform him that, because the State of Alabama did not have a nitrogen hypoxia execution protocol, he was also making a decision (or indecision) regarding the timing of his execution. This false representation constituted a material existing fact, namely the timing of his execution. As a result of this misrepresentation, Mr. Woods elected not to participate in a decision concerning his own execution. Had he known his execution would occur more quickly if he opted for nitrogen hypoxia, he would have made a different choice. Accordingly, Mr. Woods was proximately damaged as a consequence of Defendants' false representation.

*Fraudulent Suppression*. Mr. Woods also is likely to succeed on his claim that Defendants fraudulently suppressed material evidence. To prevail on this claim, Mr. Woods must show that (1) Defendants had a duty to disclose an existing material fact; (2) Defendants suppressed that existing material fact; (3) Defendants had actual knowledge of the fact; (4) Defendants' suppression of the fact induced Mr. Woods to act or to refrain from acting; and (5) Mr. Woods suffered actual harm as a proximate result. *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1998). Mr. Woods can satisfy all five elements.

Defendants owed a duty to Mr. Woods to disclose it did not have a nitrogen hypoxia protocol in place throughout June 2018 and, as such, not electing to die via nitrogen gas effectively would speed up Mr. Woods' death. Defendants have not disputed that a duty to disclose can arise from the circumstances of a case, such as the parties' relationship and their relative knowledge, the value of the information, and the plaintiff's opportunity and ability to ascertain the fact. *See State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 842-43 (Ala. 1998). As a death-sentenced

inmate, Mr. Woods is uniquely disempowered vis-à-vis Defendants. He is dependent on them in most every respect—yet another fact Defendants have not disputed.

Defendant Stewart is entrusted with Mr. Woods' well-being. *See e.g.,* Ala. Code § 14-3-13 (corrections officers' duty requires they not "ill treat or abuse any convict under [their] charge or control"). Both Defendants Dunn and Marshall took an oath to "support the Constitution of the United States" and to "faithfully and honestly discharge the duties of the office upon which [they] were] about to enter." *See* Ala. Const. § 279. In addition to owing Mr. Woods a duty as a consequence of these obligations, Defendants owed him a duty to disclose based on their asymmetrical knowledge. Defendants do not dispute that they had actual knowledge that (1) the State did not have a nitrogen-hypoxia protocol and (2) inmates who did not elect death by nitrogen gas would be executed more quickly than those who had opted into nitrogen. By contrast, at the time he was required to choose how he would die, Mr. Woods had no knowledge the State did not have the means to conduct executions using nitrogen gas or what impact not electing execution by nitrogen hypoxia would have on the scheduling of Mr. Woods' death. In addition, Defendant Stewart ordered her staff to distribute a form to Mr. Woods, purportedly to elicit his choice of how he wanted the State to kill him. This was done despite Defendants knowing they had no way to carry out nitrogen-gas executions, yet they did not mention this material fact, on the form or otherwise.

Defendants' suppression of material facts relating to Mr. Woods's execution induced him to refrain from opting into death by nitrogen gas. Had Defendants fulfilled their duties and not suppressed material facts, Mr. Woods would have opted into death by nitrogen gas during the timeline established by Ala. Code § 15-18-82.1. As a proximate cause of Defendants' fraudulent

suppression, Mr. Woods has suffered actual harm by being targeted for speedier execution due to his purported failure to knowingly and voluntarily opt into death by nitrogen gas.

*Administrative Procedure Act.* Mr. Woods is likely to prevail on his claims that Defendant Marshall violated the AAPA when he and his staff implemented the unconstitutional policy of targeting for execution only those individuals who did not opt into death by nitrogen gas.

Alabama Code § 41-22-5(a)(1) provides that, "[p]rior to the adoption, amendment, or repeal of any rule, the agency shall … [g]ive at least 35 days' notice of its intended action." Furthermore, this notice must "[a]fford all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing" and the agency "shall consider fully all written and oral submissions respecting the proposed rule." *Id.* at (a)(2). If an agency does not comply with these requirements, the rule will be considered invalid. *Id.* at (d). Mr. Woods is likely to demonstrate that Defendant Marshall's execution-targeting policy is a "rule" as defined by the AAPA—and that Defendant Marshall did not comply with the AAPA's notice requirements.

The AAPA defines a "rule" as:

> Each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency and includes any form which imposes any requirements or solicits any information not specifically required by statute or by an existing rule or by federal statute …."[1]

Ala. Code § 41-22-3(9). Here, Mr. Woods can show that Defendant Marshall's policy is a rule of "general applicability," as it applies generally to all death-sentenced inmates.

---

[1] While intra-agency memoranda and directives are not considered "rules," this is only true if those internal communications "do not substantially affect the legal rights of, or procedures available to, the public or any segment thereof." Ala. Code § 41-22-3(9)(c).

Because Defendant Marshall's execution-targeting policy is a "rule" under the AAPA, he was required to comply with the AAPA's notice provisions. He did not. Consequently, Defendant Marshall's rule is invalid as a matter of law. *See* Ala. Code § 41-22-5(d).

### 5. *Mr. Woods' meritorious claims are procedurally viable.*

For a plaintiff to be likely to succeed on the merits, he must have a viable claim. *See*, *e.g.*, *Schiavo ex rel. Schindler*, 403 F.3d at 1226 (plaintiffs could not establish likelihood of success on the merits due to procedural defects); *see also Grupo Mexicano de Desarrollo*, 527 U.S. at 339 ("Plaintiffs with questionable claims would not meet the likelihood of success criterion"). Claims brought by death-sentenced inmates pursuant to 42 U.S.C. § 1983 are not viable if untimely. *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).

Here, Mr. Woods *has* raised viable claims. Far from the "questionable claims" that warrant adverse summary judgment and therefore are not viable, *Grupo Mexicano de Desarrollo*, 527 U.S. at 339, Mr. Woods has alleged—and already demonstrated—that Defendants have violated his constitutional rights while simultaneously abrogating their duties under Alabama state law. Additionally, his claims are timely and do not suffer from any other procedural defect.

* * *

Mr. Woods is likely to succeed on the merits of his claims and, as a result, obtain summary judgment. Accordingly, this Court should grant a stay to ensure he is not executed—and therefore irreparably harmed—before judgment is final.

## C. Mr. Woods Will Suffer Irreparable Injury if a Stay is Not Granted.

If the State is not enjoined from executing Mr. Woods before this Court can resolve the merits of his claims and before that judgment becomes final, he will suffer irreparable harm. Namely, as a result of Defendants' conduct, Mr. Woods will be arbitrarily deprived of his life

without having meaningful access to counsel.  He stands to suffer a needlessly painful execution when a viable alternative exists.  All of this will occur in violation of Mr. Wood's Fourteenth Amendment rights to procedural due process and equal protection under the law, and the Eighth Amendment prohibition against cruel and unusual punishment, and in violation of Alabama law.

**D.  <u>A Stay Will Not Substantially Harm the State or Be Adverse to the Public Interest.</u>**

The harm to the State that will result from the entry of a stay is slight compared to the irreversible, unconstitutional harm that Mr. Woods would suffer if this request is denied.  As noted above, the State has an interest in the execution of its judgments.  But the delay resulting from granting temporary relief sought here will have little adverse effect upon that interest.  *See Gomez v. U.S. Dist. Ct. for Northern Dist. of Ca.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting) ("The state will get its man in the end.  In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can be never be repaired.").  Furthermore, the potential delay needed to preserve the status quo is of minimal significance given that the State was fully prepared not to execute Mr. Woods at this juncture—as that's the natural import of amending Ala. Code § 15-18-82.1 without a nitrogen-gas protocol.

Additionally, the State has an interest in conducting executions in a manner that does not violate Mr. Woods' rights to procedural due process and equal protection, and his right to be free from cruel and unusual punishment.  *See Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 702 (11th Cir. 2019) ("[N]either Alabama nor the public has any interest in carrying out an execution in a manner that violates … the laws of the United States.").  Yet, the State speedily moved to set Mr. Woods' execution date despite not having first afforded him due process and despite treating him disparately compared to other death-sentenced inmates.

Finally, the State has an interest in "increas[ing] public accountability of administrative agencies" and "assuring a minimum procedure to which all agencies will be held in the conduct of their most important functions[.]" Ala. Code § 41-22-2(b)(2) and (3). The State has few functions more important than setting executions in a manner that fully abides by Alabama law. In failing to establish a nitrogen-hypoxia protocol, without the opportunity for the public—including Mr. Woods—to comment as required under Ala. Code § 41-22-5(d), the State has set Mr. Woods' execution date without assuring the minimum procedure Alabama demands. Defendants also sought Mr. Woods' execution date in a fraudulent manner, without disclosing to him that his failure to choose nitrogen hypoxia in a timely manner would expedite his death. It is in the public interest to stay Mr. Woods' execution so that the district court can determine whether Defendants have complied with Alabama law.

Fully recognizing the important interest of both the State and the victims' family in the timely enforcement of his sentence, Mr. Woods moved to stay his execution expeditiously—first, by giving the Alabama Supreme Court an opportunity to stay its January 30, 2020 execution order and then by filing the instant motion with this Court. In addition, rather than engage in the "delay tactics" that Defendants so freely and baselessly alleges, Mr. Woods has agreed with Defendants that summary judgment is appropriate—thereby assisting this Court in being able to reach the merits of his Complaint prior to his scheduled execution date.

## III.  CONCLUSION

This Court should stay Mr. Woods' March 5, 2020 execution. He is likely to succeed on the merits of his claims, and would be irreparably harmed if the State were not enjoined from executing him in less than two weeks. The temporary stay of his execution until final judgment can be entered on Mr. Woods' Complaint will not substantially harm the State—which bears the

fault for any delays in this case due to Defendants' unlawful actions—or be adverse to the public interest.

Dated: February 24, 2020.

Respectfully submitted,

By: */s/ Marc R. Shapiro*
    Marc R. Shapiro

ORRICK, HERRINGTON & SUTCLIFFE LLP

Marc Shapiro (ASB-4186-A50S)
Jose Mario Valdes (*pro hac vice*)
51 West 52nd Street
New York, NY 10019
T: (212) 506-5000
F: (212) 506-5151
mrshapiro@orrick.com
jose.valdes@orrick.com

Warrington Parker (*pro hac vice*)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
T: (415) 773-5700
F: (415) 773-5759
wparker@orrick.com

Shane McCammon (*pro hac vice*)
1152 15th Street, N.W.
Washington, D.C. 20005
T: (202) 339-8400
F: (202) 339-8500
smccammon@orrick.com

LAW OFFICES OF J.D. LLOYD
J.D. Lloyd (ASB-LLO-011)
2151 Highland Ave. S.
Suite 310
Birmingham, AL 35205
T: 205-538-3340
F: 205-212-9701
jdlloyd@jdlloydlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that, on February 24, 2020, I served a copy of the foregoing upon counsel for Defendants by filing the same via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to: **Steve Marshall** and **Lauren Simpson**.

By: _/s/ Marc R. Shapiro_
      Marc. R. Shapiro