**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| NATHANIEL WOODS, | |
| *Plaintiff*, | |
| v. | No. 2:20-cv-00058-ECM |
| JEFFERSON DUNN, Commissioner, Alabama Department of Corrections, | |
| CYNTHIA STEWART, Warden, Holman Correctional Facility, and | |
| STEVE MARSHALL, Attorney General, State of Alabama, | |
| *Defendants*. | |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

The State of Alabama has targeted Mr. Woods for execution over other death-row inmates simply because he did not participate in the process of selecting his execution method.  The State purported to offer two methods—lethal injection and nitrogen hypoxia—but unfairly and unlawfully neglected to tell Mr. Woods the critical facts that (1) the State actually has not developed a protocol for nitrogen hypoxia and (2) that if he did not affirmatively pick the "option" of nitrogen hypoxia, he would be executed before inmates who did.  Obviously, if the State had truthfully informed him of the consequences, Mr. Woods would not have opted for his immediate execution.  The suppression of this crucial information, compounded by Defendants' failure to provide Mr. Woods' equal access to counsel during the critical window for electing a method of

1

execution, led to the State requesting an execution date in this case.  This is precisely the kind of arbitrary, unfair and cruel process that should not be sanctioned.

Given the undisputed facts, the life interest at stake, and the State's minimal interest in concealing information, this Court should deny Defendants' Motion to Dismiss and, in the Alternative, Motion for Summary Judgment—and should instead grant Mr. Woods's Cross-Motion for Summary Judgment.

I.   **Defendants improperly attempt to retract its factual concessions, but no genuine issue of material fact exists.**

Importantly, Defendants do not deny the facts that give rise to the violations of Mr. Woods' rights under the United States Constitution and Alabama law.[1]  Indeed, when they moved for summary judgment before any discovery took place, Defendants expressly conceded there are no genuine disputes of material facts before this Court.  Dkt. 19 at 9 ("Defendants respectfully move for summary judgement … because there is no issue as to any material fact").  Now that Mr. Woods has cross-moved for summary judgment, however, Defendants have retreated by trying to limit the number of material facts before this Court.  *See* Dkt. 25 at 2-5.  But notably absent from Defendants' limited recitation of material facts are those they do not contest: (1) the State and the district court facilitated meetings between the plaintiffs in the *In Re: Alabama Lethal Injection Protocol Litigation* and their attorneys to help ensure those inmates could meet the June 30, 2018 election deadline, Dkt. 22 at 4; (2) the form the State provided to Mr. Woods said nothing whatsoever about the State's plan to indefinitely suspend the execution of any inmate who elected

---

[1] Defendants did not provide this Court a statement of material facts when they moved for summary judgment.  Mr. Woods proceeded in kind while cross-moving for summary judgment.  Defendants have now attempted to retract and limit their prior concessions.  To assist the Court in distilling the relevant and undisputed, Mr. Woods has provided—as an appendix to this brief—a list of undisputed material facts.

to die via nitrogen hypoxia, *id.* at 5; (3) at the time Defendants distributed the election form and throughout the June 2018 election period, they knew the State had no means to carry out any executions via nitrogen gas, Dkt. 1 at ⁋ 40; (4) Defendants withheld this information from Mr. Woods, Dkt. 22 at 12; (5) since July 1, 2018, the State has moved to execute only those inmates who the State believed to have not opted into nitrogen hypoxia, *id.* at 6; and (6) Defendant Marshall withdrew his motion to schedule Jarrod Taylor's execution after acknowledging he mistakenly believed Mr. Taylor had not opted into nitrogen hypoxia, *id.* at 7. These facts are undisputed, and they are material to the resolution of Mr. Woods' claims—regardless of Defendants' attempts to pretend they do not exist.

Despite Defendants' attempts to walk back their previous concessions, there is no genuine factual dispute before this Court. At most, Defendants simply take issue with Mr. Woods' characterization of the agreed-upon facts. For example, Mr. Woods asserts that the State has "targeted" him for execution, a characterization that "Defendants vehemently deny[.]" Dkt. 25 at 5. But, importantly, Defendants do not deny that the Attorney General is moving to schedule the executions of only those inmates who did not opt into nitrogen hypoxia during the June 2018 election period. Regardless of the term Defendants prefer to use for their execution-scheduling policy, the undisputed fact remains that the only inmates the State currently seeks to execute are those who purportedly waived their right to die by nitrogen gas. This undisputed fact lies at the heart of Mr. Woods' constitutional claims and is among the uncontroverted evidence that supports granting him summary judgment.[2]

---

[2] To the extent Defendants now claim there are genuine disputes of material facts and this Court embraces their position, that means either discovery must be conducted or this case must proceed to trial. But, under either scenario, Defendants cannot simultaneously assert (as they do) that there are disputed material facts and they are entitled to summary judgment.

II.   **This Court should grant Mr. Woods summary judgment on his due process claim**

A.   *Defendants were obligated to disclose the State's execution-scheduling policy at the time they extended Mr. Woods the nitrogen-hypoxia offer*

Defendants fundamentally misunderstand Mr. Woods' due process claim.  Contrary to Defendants' assertions, he does *not* claim to have a "right to determine the time and date of his execution" now that "there is no longer a judicial impediment to his sentence being carried out." *See* Dkt. 25 at 7-8.  Nor does he claim that the State does not have the "lawful authority to execute [an inmate] when his appeals are exhausted."  *Id.* at 8.  Instead, Mr. Woods maintains the State cannot suppress material information, target him for execution, and then respond by acting as if he made a "choice."   *See*, *e.g.*, *United States v. Brady*, 397 U.S. 742, 756-57 (1970) ("[M]isrepresentation or other impermissible conduct by state agents" can invalidate an otherwise "voluntary plea of guilty intelligently made"); *United States v. Frye*, 402 F.3d 1123, 1127 (11th Cir. 2005) ("A plea is voluntary in a constitutional sense if the defendant receives real notice of the charge against him and understands the nature of the constitutional protections he is waiving"); *see also Pabon v. Wright*, 459 F.3d 241, 249-50 (2d Cir. 2006) ("[A]n individual cannot exercise his established right to refuse medical treatment in a meaningful and intelligent fashion unless he has sufficient information about proposed treatment."); *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990) ("Prisoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed [medical] treatment.").

Recall how events transpired.  In amending Alabama Code § 15-18-82.1, the State proposed as follows: In exchange for waiving (or mooting) their ability to challenge Alabama's lethal-injection protocol, inmates would be given the opportunity to select a potentially less painful way to die.  But because the State did not have a nitrogen-hypoxia protocol in place—and likely would not have one for years, *see* Dkt. 19 at 46—it knew it would have to indefinitely suspend the

4

execution of any inmate who opted into death by nitrogen gas.  Defendants deliberately withheld this information from Mr. Woods.  It was not until the State accidentally tipped its hand when it sought to execute Jarrod Taylor—only to have to retract the request upon realizing he had elected nitrogen hypoxia—that its suppression of critical information came to light.  Defendants respond by mischaracterizing Mr. Woods' due process claim as an attempt to "determine the time and date of his execution[.]"  *See* Dkt. 25 at 7-8.  But that's not what he seeks.  None of the inmates who chose nitrogen hypoxia know the date and time of their executions.  And Mr. Woods asks for nothing more than the rights they unwittingly stumbled into and that he was unable to secure due to Defendants' suppression.

At bottom, Defendants' position seems to be that death-row inmates have so forfeited their rights that the State is permitted to conceal information, even information that would have fundamentally altered their decisionmaking.  Without question, such detrimental reliance supplies a basis to unwind even the simplest of contracts.  But, according to the State, when someone's life hangs in the balance, the opposite outcome should follow.  That would make for an odd jurisprudence, particularly when, unlike the traditional contracting situation, constitutional rights are at stake.  Armed with no legal authority, the State's response to all of this is largely to just pound the table, insisting over and over again it must be entitled to misrepresent information with impunity to death-row inmates.  In so doing, it continually glosses over the core of Mr. Woods' claim (that he was deprived of material information) and proclaims, despite that deprivation, this nonetheless constituted a "choice" by which Mr. Woods should be bound.

Contrary to Defendants' position, the Supreme Court already has determined that the Fourteenth Amendment requires the State to provide death-sentenced inmates fair notice of processes that impact their "residual life interests." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S.

272, 281 (1998).  In Mr. Woods' cross-motion for summary judgment, he discussed at length *Woodard*'s recognition that (1) a "prisoner under a death sentence remains a living person and consequently has an interest in life," *id.* at 288, and (2) if the State offers death-row inmates a process to obtain relief from an impending execution, the State also must provide procedural safeguards to ensure the constitutional administration of that process, *see id.* at 289.[3]  This is so even if the process offered by the State is purely discretionary and even if the process takes place after the death-row inmate has exhausted his direct appeals and federal habeas proceedings.  *Id.*

Despite the clear applicability of *Woodard* here, Defendants inexplicably ignore it— beyond glibly noting that Mr. Woods "*may* have an interest" in not being "murder[ed] in his cell" by the State.  *See* Dkt. 25 at 8 (emphasis added).  Defendants claim that Mr. Woods' "'residual life interest' does not extend so far as to prohibit the State from employing a constitutional method of execution to carry out his lawfully imposed sentence."  Dkt. at 9.  But they cite no authority for that proposition.  Thus, they do nothing to undermine *Woodard*'s application here.  As *Woodard* recognizes, a court absolutely can prohibit a State from "employing a constitutional *method* of execution" if the imposition of that execution results from the State having deprived the inmate of his right to due process.  523 U.S. at 289.  Had the *Woodard* plurality determined that the State of Ohio deprived the inmate of his due process rights during the clemency process, then the Court would have stopped his execution until such time he was afforded due process.  *See id.* (noting that "a remand to permit the District Court to address respondent's specific allegations of due process violations is not required[,]" but only because "[t]he process respondent received …

---

[3] The Eleventh Circuit has explained that, because "Justice O'Connor was the fifth and decisive vote for the plurality opinion" in *Woodard*, "her concurrence set binding precedent."  *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1268, 1269 n.2 (11th Cir. 2014) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977) and *Swisher Intern., Inc., v. Schafer*, 550 F.3d 1046, 1053 (11th Cir. 2008)).

comports with Ohio's regulations and observes whatever limitations the Due Process Clause may impose on clemency proceedings."). Here, Defendants have no argument for why this Court should not apply *Woodard* and preclude the State's asserted "constitutional method of execution" until such time as the State remedies Mr. Woods' unlawful deprivation of due process.

**B.**     ***Defendants' violation of Mr. Woods' due process rights cannot be excused simply because they did not prevent him from contacting his attorney***

Defendants also mistakenly claim they did not violate Mr. Woods' due process rights because they did not *prohibit* him from contacting his attorney during the election period. Dkt. 25 at 9. But the relevant inquiry is not whether Defendants prevented Mr. Woods from obtaining his counsel's advice during June 2018; it is whether Defendants gave him the same opportunities to meet with his attorney as they provided other inmates. The undisputed facts answer this question in the negative. Specifically, Defendants do not dispute that: (1) they distributed to Mr. Woods a form that failed to supply critical information regarding the availability of nitrogen gas; (2) they distributed this form on June 26, 2018; (3) it is difficult for attorneys to meet with clients incarcerated on death row at Holman Correctional Facility; (4) because of these difficulties, Defendants facilitated meetings between attorneys from the Federal Public Defender's Office and their clients; and (5) the overwhelming majority of the 48 inmates who opted into nitrogen gas are represented by attorneys from the Federal Public Defender's Office. Defendants ignore these facts and claim Mr. Woods received due process because they did not block him from contacting his attorney. This is belied, of course, by Defendants' own actions: if Defendants truly believed that all that was due Mr. Woods and his fellow death-row inmates was to ensure the phones were working in June 2018, then they would not have facilitated in-person consults for attorneys from the Federal Public Defender's Office (bending Holman's visitation rules in the process) or distributed a form to all inmates that partially informed them of their right to opt into nitrogen gas.

7

Summary judgment for Mr. Woods is appropriate because these uncontroverted facts establish that Defendants' actions risked—and did, in fact, cause—the erroneous deprivation of Mr. Woods' private interest in understanding all material factors bearing upon a decision that directly impacts his life and his right to be free from cruel and unusual punishment. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (noting the Government's due-process obligations depend upon the private interest affected by official action; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards[;]" and "the Government's interest" in the "burdens that the additional or substitute procedural requirement would entail.") (citation omitted).

**C.      *Defendants are wrong that Mr. Woods was not harmed by their unlawful actions***

Defendants claim they are simply "honoring" the choice that Mr. Woods made when he did not opt into nitrogen hypoxia during the election period. Dkt. 25 at 8. The implication being that Mr. Woods has not been harmed by Defendants' actions because he voluntarily chose to be executed by lethal injection. But this is akin to arguing that a criminal defendant was not harmed by the State's failure to disclose *Brady* material because he voluntarily pursued a certain trial strategy that would not have been aided by the *Brady* evidence. Such an argument misses the very point: the evidence is material because he would have chosen a different strategy had he known it existed. That's precisely the reasoning the Supreme Court embraced in *United States v. Bagley*, explaining the State's failure to disclose material information "impair[s] the adversary process" because it results in the defense "abandon[ing] lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." 473 U.S. 667, 682 (1985) (citations omitted). So too here: Mr. Woods *was* harmed because he would have made a different choice had

Defendants not unlawfully mispresented and suppressed material information during the election period. And that is the only choice that Defendants should be "honoring."

### D. *Defendants have no argument that alternative procedural safeguards burden the State*

Rather than directly address the third factor of the *Mathews* analysis—the Government's interest in additional or substitute procedural safeguards—Defendants curiously claim this Court does not have the authority to grant Mr. Woods his requested relief because doing so "would constitute 'undue interference from the federal courts[.]'" Dkt. 25 at 9 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). But this ignores the long history of federal courts "interfering" with a State's unconstitutional imposition of the death penalty. *See*, *e.g.*, *Atkins v. Virginia*, 536 U.S. 304 (2002) (executing mentally retarded offenders is unconstitutional); *Ford v. Wainwright*, 477 U.S. 399 (1986) (executing insane individuals is unconstitutional); *Enmund v. Florida*, 458 U.S. 782 (1982) (death penalty is unconstitutional for a person who was a minor at the time of the felony and who did not kill, attempt to kill, or intend to kill the victim); *Coker v. Georgia*, 433 U.S. 584 (1977) (death penalty is an unconstitutional penalty for rape of an adult woman when the victim is not killed); *Woodson v. North Carolina*, 428 U.S. 153 (1976) (statutes mandating imposition of death penalty are unconstitutional); *Furman v. Georgia*, 408 U.S. 238 (1972) (death penalty cannot be imposed arbitrarily and capriciously). In fact, in *Hill* itself, the Supreme Court allowed the § 1983 suit to proceed, notwithstanding concerns it could amount to invalidation of the sentence. 547 U.S. at 581 (noting amici's concern that there may be "no endpoint to piecemeal litigation aimed at delaying the execution"). Here, by contrast, there's no contention that the claims Mr. Woods moves for summary judgment on would amount to a request that his sentence be invalidated. Mr. Woods is simply asking to be executed on the same track as others. Thus, the State's supposed interest in executing Mr. Woods will not be interfered with.

Defendants' "undue interference" argument also completely fails to address the relevant inquiry under *Mathews*: the State's interest in the "burdens" caused by the alternative procedures suggested by Mr. Woods.  Defendants invoke the State's interest in "the finality of the criminal judgments" and "seeing lawfully imposed sentences carried out in a timely manner," Dkt. 25 at 9 (citations omitted), but never once address how the State would be burdened by giving Mr. Woods the opportunity to opt into nitrogen hypoxia now that the State's previously secret execution-scheduling policy has been revealed.  While such an alternative procedure obviously would result in the suspension of Mr. Woods' execution until such time as the State develops and implements a nitrogen-hypoxia protocol, the State already has accepted this result as it relates to 48 other death-row inmates (and was prepared to accept it as to all insofar as it was offered to all).  It cannot now assert that it has more of an interest in "the finality" of Mr. Woods' criminal judgment than it has in "seeing lawfully imposed sentences carried out in a timely manner" for Jarrod Taylor and the 13 other death-row inmates whose lives remain intact due to the State's delay in developing a nitrogen-hypoxia protocol.

> **E.** ***Defendants improperly conflate Mr. Woods' due process claim with his equal protection claim***

Defendants argue this Court should deny Mr. Woods summary judgment on his due process claim because "he is not similarly situated to inmates who elected hypoxia." Dkt. 25 at 10.  But whether Mr. Woods is similarly situated to other death-row inmates goes to his claim that Defendants denied him equal protection, not to his claim that they violated his right to due process.

## III.  This Court should grant summary judgment to Mr. Woods on his Eighth Amendment "targeting" claim

Defendants' argue that Mr. Woods should be denied summary judgment on his Eighth Amendment claim for two reasons: (1) the State has not adopted a rule "targeting" Mr. Woods for

execution and (2) Mr. Woods has "failed to name a feasible, readily available, and substantially safer method of execution" as allegedly required by *Bucklew v. Precythe*, 132 S. Ct. 1112 (2019). Dkt. 25 at 10-11.

As noted above, Defendants simply take issue with Mr. Woods' characterization with the State's execution-scheduling policy. Semantics aside, Defendants do not deny that, since July 1, 2018, the State has not executed a single inmate who opted into nitrogen hypoxia during the June 2018 election period. Dkt. 1 at ¶¶ 57-68; Dkt. 22 at 5-7. Defendants also do not deny that, prior to July 1, 2018, the State scheduled inmates for execution based on when a death-sentenced inmate exhausted his appeals and federal habeas proceedings. Dkt. 19 at 7. Nor does the State dispute Mr. Woods' contention that, without judicial intervention, Defendant Marshall has unfettered discretion to hasten the executions for one group of death-row inmates based on the morally irrelevant consideration that an inmate did not opt into a method of execution that the State is not prepared to carry out—a fact that Defendants wrongfully withheld from Mr. Woods. Dkt. 22 at 19. Instead, Defendants conclude there is no "targeting" rule because they are not targeting anyone for execution; instead, Defendants are merely "honoring the decisions" of those inmates who allegedly agreed—knowingly and voluntarily—to die via lethal injection. *See* Dkt. 25 at 10-11. Defendants' circular logic aside, this argument suffers from a fatal flaw in that it depends entirely on this Court finding that Mr. Woods knowingly and voluntarily chose to be executed via lethal injection—a finding this Court simply cannot make based on the undisputed facts. Furthermore, Defendants suggest the State is only executing people like Mr. Woods because "the ADOC has access to the necessary drugs." Dkt. 25 at 11. But just because the State has a supply of lethal drugs does not mean the State must use them—or that the State can use them in an arbitrary, discriminatory, and freakish way. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 (1983)

(O'Connor, J., concurring in part and concurring in the judgment) (noting the death penalty cannot be deployed in "circumstances under which" it will be "meted out arbitrarily or capriciously or through whim or mistake." (internal quotations omitted)).

Defendants' second argument for why summary judgment on Mr. Woods' Eighth Amendment claim is not appropriate can be easily dispatched, as whether he is required to identify a feasible alternative to lethal injection goes only to the "needless suffering" aspect of his Eighth Amendment claim. As made clear in his cross-motion, Mr. Woods does not seek summary judgment on this sub-claim due to genuine issues of material fact. To the extent Defendants offer this argument in support of *their* motion for summary judgment, it simply cannot supply a basis because, as Defendants themselves acknowledge, this Court is duty-bound to apply *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317 (11th Cir. 2019), which dictates the opposite outcome.

## IV.   <u>Summary judgment is appropriate on Mr. Woods' equal protection claim</u>

Rather than address the binding case law cited by Mr. Woods in his cross-motion for summary judgment, Defendants simply insist—yet again—that he is *not* similarly situated to the inmates who, in June 2018, opted into death via nitrogen gas. This talismanic incantation does nothing to undermine the Supreme Court's recognition that the State's unequal imposition of a punishment on "those who have committed intrinsically the same quality of offense" results in "as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." *See* Dkt. 22 at 22 (quoting *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942)). Defendants acknowledge that "[o]f course a racially discriminatory policy would violate the Constitution" but then ask, "what provision of the Constitution is violated when the State schedules executions it can carry out before those executions it cannot presently carry out?"

Dkt. 25 at 10.  The answer, as *Skinner* instructs, is the Fourteenth Amendment's Equal Protection Clause.

Defendants also do not dispute Mr. Woods' uncontroverted contention that the State actively facilitated attorney consults for one group of death-row inmates but not the other—a clear violation of the Equal Protection Clause that Defendants attempt to excuse by feebly asserting that at least they did not *prevent* Mr. Woods from consulting with his attorney.  *See* Dkt. 25 at 12.  Yet, Defendants cite no authority that holds the absence of obstruction supplies a basis for disparate treatment.

Finally, Defendants do not dispute that strict scrutiny applies to Mr. Woods' equal protection claim.  *See* Dkt. 25 at 12.  As explained in Mr. Woods' cross-motion for summary judgment, strict scrutiny applies because of the fundamental rights at issue—and the State therefore "must identify a compelling government interest in withholding information from inmates and targeting for execution those who declined to participate in the election process."  Dkt. 22 at 23 (citing *Furman*, 408 U.S. at 359 n.141 (Marshall, J., concurring) and *Skinner*, 316 U.S. at 541).  The State also must show that executing one class of similarly situated inmates while indefinitely delaying another—and facilitating attorney access for some inmates but not others— is both "narrowly tailored" to achieving the State's asserted compelling interest and uses "the least restrictive means to further the articulated interest."  *See*, *e.g.*, *Sable Comm. of Calif. v. F.C.C.*, 492 U.S. 115, 126 (1989) (citations omitted).  Not only have Defendants failed to address this burden, they cannot meet it given the undisputed facts in this case.  That's because the State does not have a compelling interest in discriminating against one group of similarly situated inmates

when that discrimination directly results from Defendants' deliberate withholding of material information and from Defendants' unequal facilitation of attorney consults.[4]

## V.   This Court should grant summary judgment on Mr. Woods' state-law fraud claims

Defendants maintain they did not fraudulently mispresent or suppress information because they had "no duty to provide Woods with detailed information about the ADOC's execution protocols." Dkt. 25 at 13.  This assertion is a strawman.  Mr. Woods has never professed to be entitled to *detailed* information about the nitrogen-hypoxia protocol.  What the State seems to ignore is that, unlike the traditional lethal injection challenge (whose jurisprudence it repeatedly invokes), here the State offered inmates a choice.  Having done so, it was not entitled to withhold material information bearing upon that decision—i.e., the fact that the State did not have an execution protocol for nitrogen hypoxia, which would impact the timing of his execution.  Dkt. 22 at 12-13 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (citation and internal quotations omitted); *Sessions v. Dimaya*, 584 U.S. ___, 138 S. Ct. 1204, 1225 (2018) (Gorsuch, J., concurring) ("Perhaps the most basic of due process's customary protections is the demand for fair notice." (citations omitted)).  Of course, Defendants did not tell Mr. Woods this—and not even his attorney had reason to believe the State secretly knew it could be *years* before it would be able to execute any inmates via nitrogen gas.

In far less significant circumstances, courts have recognized that where, as here, the government misrepresents the terms of an offer, the resulting agreement is invalid.  Indeed, "[u]nder the implied duty of good faith and fair dealing, the Government maintains an implied

---

[4] Furthermore, even assuming Defendants can articulate a compelling state interest for their discriminatory treatment, Defendants cannot reasonably argue that executing Mr. Woods is the "least restrictive means to further the articulated interest"—especially not when the State already has accepted that it must indefinitely suspend the executions of 48 similarly situated inmates.

duty to disclose information fundamental to the preparation of estimates or contract performance."

*E.g., Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 674 (1994).  Therefore, "where the

Government possesses special knowledge not shared by the contractor, which is vital to the

performance of the contract, the Government has an affirmative duty to disclose such knowledge.

*It cannot remain silent with impunity*."  *Hardeman-Monier-Hutcherson v. United States*, 458 F.2d

1364, 1371-72 (Ct. Cl. 1972) (citing *Helene Curtis Indus. v. United States*, 312 F.2d 774, 778 (Ct.

Cl. 1963) (emphasis added)).  This is true even though the Government is not a fiduciary for its

contractors, in large part because "the Government—where the balance of knowledge is so clearly

on its side—can no more betray a contractor into a ruinous course of action by silence than by the

written or spoken word."  *Helene Curtis Indus.*, 312 F.2d at 778.  Yet here, Defendants would have

this Court believe the State *can* remain silent with impunity despite having superior knowledge of

information that was critical to a decision that impacted whether Mr. Woods would die within

months or would have his life indefinitely spared.  If contract principles obligate the State to

disclose material information to asphalt suppliers and elevator maintainers, then surely Alabama

law and the Fourteenth Amendment compel the State to divulge life-saving facts in order to avoid

betraying a death-row inmate into a ruinous decision.  Though seemingly suggesting otherwise,

Defendants cite no "death row inmate" exception that would confer upon the State less of an

obligation to Mr. Woods than it has to routine contractors.

**VI.   This Court should grant summary judgment on Mr. Woods' claim that Defendant Marshall violated the Alabama Administrative Procedure Act**

Defendants do not even attempt to explain how Defendant Marshall's execution-

scheduling policy is not a "rule" as defined by the Alabama Administrative Act. Dkt. 25 at 13-14.

Nor do Defendants muster an argument that somehow the AAPA does not apply to Defendant

Marshall or suggest that Defendant Marshall did in fact comply with the AAPA's notice

requirements.  *Id.*   Instead, Defendants conclude—again, without any analysis or legal support—that Defendant Marshall did not create a rule when he started seeking execution dates based on whether an inmate had opted into nitrogen hypoxia.  How Defendants reached this conclusion is anybody's guess, but the undisputed facts establish that Defendant Marshall's execution-scheduling policy is a "rule" as defined by the AAPA, as it is an "agency regulation, standard, or statement of general applicability that implements … law or policy[.]"  *See* Dkt. 22 at 29-30 (quoting Ala. Code § 41-22-3(9)).

## VII. <u>Because Mr. Woods is entitled to summary judgment, this Court should grant injunctive relief</u>

Based on the undisputed facts before this Court and the binding case law that Defendants have failed to acknowledge (let alone distinguish), this Court should grant Mr. Woods his requested relief.  The Eleventh Circuit has explained that a permanent injunction is appropriate when the moving party has shown "(1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest."  *Thomas v. Bryant*, 614 F.3d 1288, 1317 (11th Cir. 2010) (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005)).  This Court "must also ensure that the scope of the awarded relief does not exceed the identified harm."  *Id.* at 1317-18 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established"); *LaMarca v. Turner*, 995 F.2d 1526, 1543 (11th Cir. 1993) ("While district courts have broad discretion to fashion equitable relief, such relief must target the existing wrong.")).

For the reasons detailed above, Mr. Woods has prevailed in establishing that Defendants have violated his rights under the United States Constitution, Alabama Constitution, and Alabama state law. Given the nature of these violations, there is no adequate remedy at law other than enjoining Defendants from executing him via lethal injection and allowing him to opt into death via nitrogen gas now that he is aware of the material information that Defendants wrongfully withheld from him during the June 2018 election period. Of course, this Court has the authority to craft any additional or alternative terms of an injunction, such as enjoining the Attorney General from exercising his discretion in an unlawful manner and instead adopt a strict policy such as one predicated upon timing from completion of federal habeas. The bottom line is that absent a permanent injunction, Mr. Woods will suffer the most irreparable harm imaginable—he will be killed in less than two weeks. Finally, an injunction is not adverse to the public interest for the reasons detailed above—the State has already indefinitely suspended the executions of 48 other similarly situated death-sentenced inmates.

## VIII.  Conclusion

This Court should not accept Defendants' position that death-row inmates have so forfeited their rights that the State may conceal information to them, particularly when that information would have fundamentally altered Mr. Woods' decisionmaking. Nor should it adopt the State's theory that disparate treatment necessitates active interference with the attorney-client relationship rather than simply facilitating privileges to certain inmates and not others. The undisputed facts, coupled with binding case law, mandates summary judgment in Mr. Woods' favor.

Dated: February 24, 2020.

17

Respectfully submitted,

By: */s/ Marc R. Shapiro*
    Marc R. Shapiro

ORRICK, HERRINGTON & SUTCLIFFE LLP

Marc Shapiro (ASB-4186-A50S)
Jose Mario Valdes (*pro hac vice*)
51 West 52nd Street
New York, NY 10019
T: (212) 506-5000
F: (212) 506-5151
mrshapiro@orrick.com
jose.valdes@orrick.com

Warrington Parker (*pro hac vice*)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
T: (415) 773-5700
F: (415) 773-5759
wparker@orrick.com

Shane McCammon (*pro hac vice*)
1152 15th Street, N.W.
Washington, D.C. 20005
T: (202) 339-8400
F: (202) 339-8500
smccammon@orrick.com


LAW OFFICES OF J.D. LLOYD
J.D. Lloyd (ASB-LLO-011)
2151 Highland Ave. S.
Suite 310
Birmingham, AL 35205
T: 205-538-3340
F: 205-212-9701
jdlloyd@jdlloydlaw.com

## **APPENDIX**

### ***Undisputed Material Facts***

1.   Lethal injection is Alabama's default method of execution.   *Comp*., Dkt. 1 at ¶ 35; *Defendants' Motion to Dismiss and, in the Alternative, Motion for Summary Judgment*, Dkt. 19 at 54; *Plaintiff's Opposition to Defendant's Motion to Dismiss and, in the Alternative, Motion for Summary Judgment, and Plaintiff's Cross-Motion for Summary Judgment*, Dkt. 22 at 2.

2.   On April 6, 2012, inmate Carey Dale Grayson sued the State of Alabama, alleging that the state's lethal-injection protocol (and the secrecy then surrounding it) violated his Eighth and Fourteenth Amendment rights. Other death-sentenced inmates eventually filed their own complaints, which were consolidated in the U.S. District Court, Middle District of Alabama, as *In Re: Alabama Lethal Injection Protocol Litigation*, No. 12-cv-00316 (M.D. Ala.).   In that litigation, plaintiffs proposed nitrogen gas as an alternative method of execution.   Dkt. 1 at ¶ 36; Dkt. 19 at 46 n.153; Dkt. 22 at 2-3.

3.   While *In Re: Alabama Lethal Injection Protocol Litigation* was pending, on June 1, 2018, the State of Alabama amended its laws to allow death-sentenced inmates to choose the manner by which they would be executed: by Alabama's default method of lethal injection or by nitrogen hypoxia. *See* 2018 Alabama Laws Act 2018-353 (S.B. 272).   Dkt. 1 at ¶ 32 and ¶ 37; Dkt. 19 at 4; Dkt. 22 at 3.

4.   Inmates whose death sentences had become final prior to the amendment's enactment, like Plaintiff Nathaniel Woods, were given 30 days to make this election. Ala. Code § 15-18-82.1(b)(2).  Dkt. 1 ¶ 37; Dkt. 19 at 4; Dkt. 22 at 3.

19

5.     At the time of the amendment's enactment and throughout the 30-day election period, the State of Alabama had not created or implemented a protocol by which it would carry out executions using nitrogen hypoxia. Dkt. 1 at ¶ 39; Dkt. 19 at 4; Dkt. 22 at 3; *see also Price v. Comm'r, Dep't of Corrs.*, 920 F.3d 1317, 1327 (11th Cir. 2019).

6.     Because the State did not have a nitrogen-hypoxia protocol in place by July 1, 2018, the State had no way to carry out any executions via nitrogen hypoxia. Dkt. 1 at ¶ 39; Dkt. 19 at 39-40; Dkt. 22 at 3-4.

7.     Defendants were aware from the date of the adoption of the legislation through the 30-day time period for inmates to elect a method of execution that the State of Alabama had not created or implemented a nitrogen hypoxia execution protocol. Dkt. 1 at ¶ 40; Dkt. 19 at 40; Dkt. 22 at 3.

8.     The State did not share this fact with Mr. Woods. Dkt. 1 at ¶ 40; Dkt. 19 at 42-43; Dkt. 22 at 4.

9.     Following amendment to Ala. Code § 15-18-82.1, the parties to the *In Re: Alabama Lethal Injection Protocol Litigation* began to discuss whether the plaintiffs' claims were moot now that Alabama purported to provide for an alternative means for execution. Dkt. 1 at ¶ 41; Dkt. 19 at 15-16; Dkt. 22 at 4.

10.     The plaintiffs in the consolidated litigation asked for special accommodations to speak with their attorneys prior to the June 30, 2018 deadline imposed by Ala. Code § 15-18-82.1. Dkt. 1 at ¶ 42; Dkt. 22 at 4.

11.     These special accommodations were necessitated by protocols in place at Holman Correctional Facility for attorney-client meetings with death-row inmates. Dkt. 1 at ¶ 42; Dkt. 22 at 4.

12. The district court facilitated meetings between the plaintiffs and their attorneys so that the plaintiffs could discuss the impact of Ala. Code § 15-18-82.1 in advance of the June 30, 2018 deadline.  Dkt. 1 at ¶ 43; Dkt. 22 at 4.

13. On June 26, 2018, Defendants allowed attorneys from the Federal Public Defender's Office to meet with their death-row clients as a group—a deviation from the Department of Corrections and Holman Correctional Facility's rules and regulations.  Dkt. 22 at 22.

14. Because he was not a party to the *In Re: Alabama Lethal Injection Protocol Litigation* or represented by the Federal Public Defender's Office, Plaintiff was not provided special accommodations to confer with his attorney.  Dkt. 1 at ¶ 43; Dkt. 22 at 4.

15. During the June 2018 election period, Mr. Woods was represented by Mr. J.D. Lloyd.  Dkt. 25 at 2.

16. Attorneys from the Federal Public Defender's Office prepared and brought an "election form" with them when they visited Holman Correctional Facility on June 26, 2018.  Dkt. 1 at ¶ 48; Dkt. 19 at 17; Dkt. 22 at 5.

17. The attorneys from the Federal Public Defender's Office distributed the form to their death-sentenced clients.  Dkt. 1 at ¶ 48; *see also Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1324 n.4 (11th Cir. 2019) ("The State admits that it did not create the election form. Rather, it claims the Federal Public Defender's Office created the form and gave a copy of it to the warden of Holman.").

18. The form prepared by the Federal Public Defender's Office did not include any information about the State's lack of a nitrogen-hypoxia protocol or in any way note that the State would need to indefinitely suspend the executions of the inmates who opted into nitrogen hypoxia.  Dkt. 1 at ¶ 47; Dkt. 22 at 5.

19. After conferring with their attorneys, the inmates represented by the Federal Public Defender's Office opted into nitrogen hypoxia, providing completed election forms to Defendant Stewart prior to July 1, 2018. Dkt. 1 at ¶ 44; Dkt. 19 at 15-16; Dkt. 22 at 4-5.

20. Defendants, having seen the form prepared and distributed by the Federal Public Defender's Office, unilaterally copied it and facilitated distribution of it to every death-sentenced inmate. Dkt. 1 at ¶ 48; Dkt. 19 at 17; Dkt. 22 at 5; *see also Price*, 920 F.3d at 1324 ("The record contains the affidavit of Captain Jeff Emberton, who attested to the fact … that the warden of Holman directed him to provide every death-row inmate an election form and an envelope.").

21. The form was distributed to Mr. Woods and other death-sentenced inmates on or after June 26, 2018. Dkt. 1 at ¶ 49; Dkt. 25 at 2.

22. After the plaintiffs in the *In Re: Alabama Lethal Injection Protocol Litigation* made their election pursuant to Ala. Code § 15-18-82.1, the parties jointly moved to dismiss the complaint for mootness. The joint motion to dismiss was filed on July 10, 2018. The Court granted the motion the next day, dismissing the complaint without prejudice. Dkt. 1 at ¶ 46; Dkt. 19 at 15-16; Dkt. 22 at 5.

23. In total, 48 inmates elected nitrogen hypoxia. Dkt. 1 at ¶ 45; Dkt. 19 at 8; Dkt. 22 at 4-5.

24. Before the June 30, 2018 deadline, Mr. Woods did not complete or submit the form distributed to him on or after June 26, 2018, and did not otherwise provide written notice to Defendants that he wished to opt into nitrogen hypoxia. Dkt. 1 at ¶ 50; Dkt. 19 at 18; Dkt. 22 at 5.

25. Since June 30, 2018, eighteen (18) Alabama death-sentenced inmates have completed federal habeas review. Dkt. 1 at ¶ 57; Dkt. 22 at 5.

26.   Of the eighteen (18) inmates who have exhausted their federal habeas review, fourteen (14) opted into nitrogen hypoxia within the June 2018 election period set by Ala. Code § 15-18-82.1.  Dkt. 22 at 21.

27.   Prior to June 30, 2018, the State of Alabama moved chronologically to set execution dates based on the timing of a death-sentenced inmate's exhaustion of his or her direct appeals, state post-conviction relief, and federal habeas review.  Dkt. 19 at 7; Dkt. 22 at 13.

28.   The State has moved to execute five inmates since June 30, 2018, believing all of them were scheduled to die by lethal injection: Domineque Ray, Michael Brandon Samra, Christopher Lee Price, Jarrod Taylor, and Nathaniel Woods.  Dkt. 1 at ¶ 58; Dkt. 22 at 5-7.

29.   Domineque Ray and Michael Brandon Samra were executed in the first half of 2019, both via lethal injection.  Dkt. 1 at ¶¶ 59-60; Dkt. 22 at 6.

30.   Christopher Lee Price desired to be executed via nitrogen hypoxia. Dkt. 1 at ¶ 61; Dkt. 19 at 19; Dkt. 22 at 6.

31.   On January 27, 2019—more than a month before the Alabama Supreme Court scheduled his execution—Mr. Price wrote a letter to Defendant Stewart, asking to be executed by nitrogen hypoxia, but this request was denied as untimely.  Dkt. 1 at ¶ 61; Dkt. 19 at 19; Dkt. 22 at 6.

32.   The State ultimately executed Mr. Price on May 30, 2019 via lethal injection.  Dkt. 1 at ¶ 65; Dkt. 19 at 29; Dkt. 22 at 7.

33.   On July 29, 2019, Defendant Marshall moved the Alabama Supreme Court to schedule Jarrod Taylor's execution. Dkt. 1 at ¶ 66; Dkt. 22 at 7.

34.   As part of the motion, Defendant Marshall represented that Mr. Taylor had not made a timely election of death by nitrogen hypoxia.  Dkt. 1 at ¶ 66; Dkt. 22 at 7.

35.   On July 30, 2019, Mr. Taylor's counsel informed Defendant Marshall that Mr. Taylor had, in fact, timely elected death by nitrogen hypoxia. A day later, Mr. Taylor's counsel provided Defendant Marshall documentation showing Mr. Taylor's timely election. Dkt. 1 at ⁋ 67; Dkt. 22 at 7.

36.   On August 2, 2019, Defendant Marshall moved to withdraw the motion to set Mr. Taylor's execution date. In support of the motion to withdraw, Defendant Marshall affirmed that "ADOC is not yet prepared to proceed with an execution by nitrogen hypoxia[.]" Dkt. 1 at ⁋ 68; Dkt. 22 at 7.

37.   In April 2019, the State of Alabama disclosed that it had not yet created or implemented a protocol or acquired the means to execute inmates via nitrogen hypoxia. Death-sentenced inmates had no knowledge of when the State of Alabama would adopt such a protocol; it was possible, from their perspective, the State could have done so at any point leading up to the date it moved to sentence Mr. Woods' execution. Dkt. 1 at ⁋ 69; Dkt. 22 at 7.

38.   Lacking a nitrogen hypoxia protocol, Defendants have not moved to set an execution date for any inmate who has elected death by nitrogen hypoxia. Dkt. 1 at ⁋ 70; Dkt. 19 at 37; Dkt. 22 at 21. The sole exception is Defendants' mistaken effort to schedule an execution date for Jarrod Taylor. Dkt. 1 at ⁋⁋ 66-68; Dkt. 22 at 7.

39.   Mr. Woods' federal habeas review was completed on October 7, 2019, when the U.S. Supreme Court denied him a writ of certiorari. Dkt. 1 at ⁋ 31; Dkt. 19 at 7.

40.   On October 29, 2019, the State of Alabama moved the Alabama Supreme Court to set an execution date. Plaintiff opposed the motion on December 5, 2019. Dkt. 1 at ⁋ 33; Dkt. 19 at 30.

41.   On January 23, 2020, Mr. Woods filed the instant lawsuit. Dkt. 1; Dkt. 19 at 30.

42.   On January 30, 2020, the Alabama Supreme Court granted the State's motion to schedule Mr. Woods' execution, setting the date for March 5, 2020.  Dkt. 19 at 30.

43.   Mr. Woods filed a petition for stay of execution with the Alabama Supreme Court on February 7, 2020.  *Woods v. Alabama*, Dkt. No. 1071034 (Ala. Sup. Ct. Feb. 7, 2020).

44.   On February 14, 2020, the Alabama Supreme Court denied Mr. Woods' petition for stay of execution.  *Id.*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 24, 2020, I served a copy of the foregoing upon counsel for Defendants by filing the same via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to: **Steve Marshall** and **Lauren Simpson**.

By: */s/ Marc R. Shapiro*
Marc. R. Shapiro

26