IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NATHANIEL WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:20-cv-58-ECM |
| | ) | (WO) |
| JEFFERSON S. DUNN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Nathaniel Woods (hereinafter "Woods") is an Alabama death row inmate in the custody of the Alabama Department of Corrections ("ADOC"). Woods is scheduled for execution on March 5, 2020. On January 23, 2020, Woods filed a complaint pursuant to 42 U.S.C. § 1983, against Defendants Jefferson Dunn, Commissioner, ADOC; Cynthia Stewart, Warden, Holman Correctional Facility; and Steve Marshall, Attorney General, State of Alabama (hereinafter collectively "the State"), individually[1] and in their official capacities, alleging violations of his federal constitutional rights under the Eighth and Fourteenth Amendments and violations of Alabama state law. Woods seeks declaratory and injunctive relief. (Doc. 1).

---

[1] The parties acknowledge that the equitable relief Woods seeks would be from the Defendants in their official capacities. Woods concedes that his claims against the Defendants in their individual capacities are due to be dismissed. (Doc. 22 at 8 n.3; Doc. 32 at 2-3). Therefore, Woods' claims against the Defendants in their individual capacities will be dismissed.

This matter is before the Court on the State's motion to dismiss and, in the alternative, motion for summary judgment (doc. 19),[2] Woods' cross-motion for summary judgment[3] (doc. 22), and Woods' motion for a stay of execution (doc. 29).  Being fully briefed, these motions were heard at oral argument on February 26, 2020, and are ripe for adjudication.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Woods' Capital Litigation History

In 2004, a Jefferson County, Alabama grand jury indicted Woods on four counts of capital murder for intentionally causing the deaths of three Birmingham police officers, Carlos Owen, Harley A. Chisolm, III, and Charles R. Bennett, in violation of Ala. Code  § 13A-5-40(a)(5), while they were on duty as police officers at "the green apartments," in an area of town known for drug problems.[4]  After a trial in October 2005, a jury found Woods guilty of the four charges.  By a vote of 10 to 2, the jury recommended that Woods be sentenced to death.  Following a sentencing hearing in December 2005, the trial court accepted the jury's recommendation and sentenced Woods to death.  *See Woods v. State*, 13 So. 3d 1, 4-5 (Ala. Crim. App. 2007).

---

[2] On the cross-motions for summary judgment, both parties submitted evidence to the Court for its consideration on the motions.  Consequently, without objection, the State's motion to dismiss and in the alternative, motion for summary judgment is converted to a motion for summary judgment.  (Doc. 32 at 3).

[3] Woods cross-moved for summary judgment on all claims except for his Eighth Amendment method-of-execution claim challenging Alabama's midazolam lethal injection protocol.  (Doc. 22 at 2 n.1).

[4] In the fourth count of capital murder, Woods was charged with intentionally causing the deaths of these officers by one act or pursuant to one scheme or course of conduct in violation of Ala. Code § 13A-5-40(a)(10).

In 2007, the Alabama Court of Criminal Appeals ("ACCA") affirmed Woods' convictions and sentence after remand for an amended sentencing order. *Woods*, 13 So. 3d at 43 (opinion on return to remand). After Woods did not move for rehearing or file a petition for a writ of certiorari to the Alabama Supreme Court, the ACCA issued a certificate of judgment on January 9, 2008. Then, on May 9, 2008, more than five months after the ACCA affirmed his convictions, Woods moved the ACCA to set aside the certificate of judgment and allow him to file an application for rehearing. In October 2008, the ACCA denied this motion. *See Woods v. State*, 221 So. 3d 1125, 1130 (Ala. Crim. App. 2016).

Woods then sought relief from the Alabama Supreme Court. In August 2009, the Alabama Supreme Court denied Woods' motion for an out-of-time appeal to that court. *See id.* On February 22, 2010, the U.S. Supreme Court denied certiorari. *Woods v. Alabama*, 559 U.S. 942 (2010) (mem.).

In December 2008, Woods also filed a petition in the trial court for collateral relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. Following the State's response in opposition thereto, on December 1, 2010, the court summarily dismissed Woods' Rule 32 petition. The ACCA affirmed, and the Alabama Supreme Court denied certiorari. *Woods v. State,* 221 So. 3d 1125 (Ala. Crim. App. 2016). Woods did not pursue an appeal to the U.S. Supreme Court.

Next, Woods filed a federal habeas corpus petition, pursuant to 28 U.S.C. § 2254, in the Northern District of Alabama. *Woods v. Stewart*, 2018 WL 3455686 (N.D. Ala. 2018). After Woods filed two amended habeas petitions and the State responded thereto,

the district court summarily dismissed the petition and denied Woods a certificate of appealability ("COA").  *Id.*

Thereafter, Woods unsuccessfully sought a COA from the Eleventh Circuit Court of Appeals.  *Woods v. Warden Holman CF*, 2019 WL 5866719 (11th Cir. 2019).  The U.S. Supreme Court denied certiorari on October 7, 2019, *Woods v. Stewart*, 140 S. Ct. 67 (2019) (mem.), concluding Woods' appeals.

**B.     Backdrop of the Present Action**

*1.  Nitrogen hypoxia authorized as second alternative method of execution*

Lethal injection is Alabama's default method of execution.  ALA. CODE  § 15-18-82.1(a).  In March 2018, the Alabama Legislature amended Alabama's Code[5] to add nitrogen hypoxia as another alternative execution method, in addition to electrocution.[6]  Pursuant to Ala. Code § 15-18-82(b), Alabama affords a death row inmate one opportunity to elect one of the alternative execution methods.

This amendment to the code became effective on June 1, 2018.  The timing and procedure an inmate must follow to elect nitrogen hypoxia are outlined in Ala. Code  § 15-18-82(b)(2), which states:

> The election for death by nitrogen hypoxia is waived unless it is personally made by the person in writing and delivered to the warden of the correctional facility within 30 days after the certificate of judgment pursuant to a decision by the Alabama Supreme Court affirming the sentence of death.  If a certificate of judgment is issued before June 1, 2018, the election must be

---

[5] Specifically, Ala. Code §§ 15-18-82(a)-(b) and 15-18-82.1(a)-(c), (f), (i)-(j) were amended.

[6] *See* 2018 Alabama Laws Act 2018-353 (S.B. 272).

> made and delivered to the warden within 30 days of that date.
> If a warrant of execution is pending on June 1, 2018, or if a
> warrant is issued within 30 days of that date, the person who is
> the subject of the warrant shall waive election of nitrogen
> hypoxia as the method of execution unless a written election
> signed by the person is submitted to the warden of the
> correctional facility not later than 48 hours after June 1, 2018,
> or after the warrant is issued, whichever is later.

*Id.*

As this amendment pertains to Woods, the certificate of judgment on his convictions issued on January 9, 2008.  Thus, from June 1 to June 30, 2018, Woods, like all other death-sentenced inmates whose certificates of judgment issued prior to June 1, 2018, had the opportunity to elect an execution by nitrogen hypoxia.  Woods did not make that election during this time.

### 2. The midazolam litigation that was dismissed in 2018

In April 2012, death row inmate Carey Dale Grayson filed an action under 42 U.S.C. § 1983 challenging the constitutionality of Alabama's lethal injection protocol, alleging that it violated his Eighth and Fourteenth Amendment rights.  *See Grayson v. Dunn*, 2:12-cv-316-WKW, Doc. 1 (M.D. Ala. 2012).  Over time,  several other death row inmates filed nearly identical challenges to Alabama's lethal injection protocol.   Ultimately, on the parties' joint motion to consolidate, due to the common questions of law and fact, in April 2016, these cases were consolidated to promote judicial economy, eliminate duplication of discovery, and avoid unnecessary costs.  *Id.*  Additionally, the litigation was recaptioned as *In re:  Alabama Lethal Injection Protocol Litigation*, 2:12-cv-316-WKW (M.D. Ala. 2012).

In that litigation, the plaintiffs proposed nitrogen hypoxia as an alternative execution method.  The State's addition of nitrogen hypoxia as an alternative method of execution essentially mooted the remaining plaintiffs' claims in *In re:  Alabama Lethal Injection Protocol Litigation*.  Indeed, after June 1, 2018, they all elected nitrogen hypoxia, and the *In re:  Alabama Lethal Injection Protocol Litigation* was dismissed without prejudice on the parties' joint motion to dismiss.  2:12-cv-316-WKW, Docs. 429-30.

*3.  Distribution of the election form during election period*

It is undisputed that on or about June 26, 2018, the ADOC distributed a nitrogen hypoxia election form to all death-sentenced inmates.  (Doc. 1 ⸮ 17; Doc. 19 at 17-18; Doc. 22-3 ⸮ 10).  It is undisputed that this form was not drafted by the State, but was drafted by an attorney in the Federal Defender's Office. (Doc. 22-3 ⸮ 4).  This form states:

> ELECTION TO BE EXECUTED BY NITROGEN HYPOXIA
> Pursuant to Act No. 2018-353, if I am to be executed, I elect that it be by nitrogen hypoxia rather than by lethal injection.  This election is not intended to affect the status of any challenge(s) (current or future) to my conviction(s) or sentence(s), nor waive my right to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia.
>
> Dated this _____ day of June, 2018.
>
> _____          _____
> Name/Inmate Number                              Signature

(*Id.*).

It is undisputed that Woods received the election form, but did not complete it during the election period.  However, on January 31, 2020, the day after the Alabama

Supreme Court set his execution date, Woods signed the form.[7]

During the thirty-day election period from June 1 to June 30, 2018, 48 inmates elected nitrogen hypoxia. *See Dunn v. Price*, 139 S. Ct. 1312 (2019). There are 175 death row inmates in Alabama. (Doc. 19 at 4).[8] Thus, fewer than one-third of those inmates elected nitrogen hypoxia. A majority of the death row inmates remain subject to execution by lethal injection once they have exhausted their appeals.

### 4. *No execution protocol developed for nitrogen hypoxia*

When the Alabama Code was amended to add nitrogen hypoxia as a second alternative execution method, and throughout the election period, the ADOC had not yet developed a protocol for performing nitrogen hypoxia executions.[9] The State advises that it is "diligently working to formulate a safe hypoxia protocol." (Doc. 19 at 7). Until the ADOC has such protocol, the State of Alabama is unable to execute an inmate by nitrogen hypoxia.

### 5. *Executions performed after the nitrogen hypoxia election period closed*

While the State is currently unable to perform nitrogen hypoxia executions, it has proceeded with the executions of death row inmates who have completed their appeals and

---

[7] On January 31, 2020, an ADOC employee and notary public at Holman Correctional Facility witnessed Woods' signature on the nitrogen hypoxia election form. (Doc. 19-3).

[8] Citations to page numbers in documents filed in this case will be to the page number generated by the Court's CM/ECF system.

[9] When amending Alabama's Code to add nitrogen hypoxia as a second authorized execution method, the Alabama Legislature did not require the ADOC to have a nitrogen hypoxia protocol in place by the amendment's effective date. The legislation is silent as to such requirement. *See* 2018 Alabama Laws Act 2018-353 (S.B. 272).

who did not elect nitrogen hypoxia.  Since passage of the law allowing for nitrogen hypoxia as an alternative method of execution, three inmates have been executed by lethal injection: Dominique Ray (February 7, 2019), Michael Brandon Samra (May 16, 2019), and Christopher Lee Price (May 30, 2019).  (Doc. 22 at 6).

**C.    Woods' Claims**

Woods filed this action on January 23, 2020 raising three federal constitutional claims and three state law claims.  Woods' claims, paraphrased and summarized, are as follows:

Count 1.  The procedure by which the State "foisted upon him an obligation to choose the manner in which he will be executed" (doc. 1 ¶ 74) violates his right to procedural due process under the Fourteenth Amendment to the U.S. Constitution;

Count 2.  Alabama's lethal injection three-drug protocol method of execution violates his right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution.  Woods also contends that Alabama discriminated against him by targeting him for speedier execution based solely on his method of execution and that such conduct is arbitrary and wanton in violation of the Eighth Amendment.  (*Id*. ¶¶ 83-85);

Count 3.  Alabama has subjected Woods to disparate treatment, compared to other death-sentenced inmates who have exhausted their appeals, and targeted him for execution sooner than those other inmates in violation of his right to equal protection under the Fourteenth Amendment to the U.S. Constitution.  Woods further contends that the State violated equal protection by treating him differently from the plaintiff-inmates in the *In re:*

*Alabama Lethal Injection Protocol Litigation* by facilitating those inmates' access to their attorneys during the election period but not doing the same for him;

Count 4.  The State made a fraudulent misrepresentation to Woods, in violation of Alabama law, when it gave him the option to elect nitrogen hypoxia as his execution method, by failing to disclose that Alabama did not have a protocol for the method.  Woods appears to contend that based on such non-disclosure, he did not elect nitrogen hypoxia but that he would have done so had he known that such election would affect, *i.e.*, postpone, the timing of his execution;

Count 5.  The State committed fraudulent suppression, in violation of Alabama law, by failing to disclose to Woods, during the election period, the material fact that Alabama had no nitrogen hypoxia protocol, and that such failure affected his decision not to elect nitrogen hypoxia as his execution method, ultimately resulting in his execution being scheduled sooner than it would have been had he made the election; and

Count 6.  The State's execution-scheduling rule for death row inmates who did not elect nitrogen hypoxia falls within the ambit of the Alabama Administrative Procedure Act ("AAPA"), is in violation thereof, and is invalid because the State failed to comply with the AAPA when establishing this rule.

On January 30, 2020, the State filed a notice of execution date giving notice that the Alabama Supreme Court had set Woods' execution for March 5, 2020.  (Doc. 10).  Under an expedited briefing schedule, the State filed a motion to dismiss and, in the alternative, a motion for summary judgment on February 6, 2020.  (Doc. 19).  In response, on February 13, 2020, Woods filed his opposition and cross-motion for summary judgment.  (Doc. 22).

On February 14, 2020, the Court entered an order setting oral argument on all pending motions for February 26, 2020.  (Doc. 23).  On February 24, 2020, Woods filed a motion to stay his execution.  (Doc. 29).  The motions being fully briefed, the Court held oral argument on February 26, 2020.

The Court notes that the need for an expedited process in adjudicating Woods' constitutional claims was avoidable, as this case could have been brought much earlier.  Unnecessarily delaying suit until an execution date is looming invites the type of muddled imprecision in the pleadings, briefs, and arguments that plagues this action.  To the extent the complaint provides the foundation for Woods' claims, it is built on shifting sand.  The complaint is internally inconsistent, and Woods' arguments, evolving.  For example, Woods asserts that had the State disclosed that it did not have a nitrogen hypoxia protocol, he "would have opted into death by nitrogen gas during the timeline established by Ala. Code § 15-18-82.1."  (Doc. 1 ⁋ 109).  However, in his prayer for relief, Woods asks the Court to order the State "to afford Mr. Woods an additional thirty days to confer with his attorney[s] following disclosure of the nitrogen hypoxia protocol and determine whether he wishes to elect death by nitrogen gas, or, alternatively, thirty days from a date so ordered by this Court."  (Doc. 1 at 24).  At oral argument, Woods emphasized that he asks that the State be enjoined from conducting any executions until a nitrogen hypoxia protocol is adopted.  (Doc. 32 at 32-33).

Furthermore, in his complaint, Woods asserts that "[o]n June 1, 2018, death row inmates were told that they had 30 days to make a choice whether to participate in their executions by choosing a method of execution"; and that, "their options were lethal

10

injunction [sic] (Alabama's oft-challenged and presumptive method of execution) or nitrogen hypoxia (an unexplored option that this State recently made available)." (Doc. 1 ¶ 1).  At oral argument, however, Woods argues that he only first received information about the election on June 26, 2018 when he received the election form.  (Doc. 32 at 76-77).

Notwithstanding the expedited nature of this case, the Court has carefully considered the parties' positions and the record before it.

### III.  STANDARD OF REVIEW FOR CROSS-MOTIONS FOR SUMMARY JUDGMENT

Under Rule 56(a) of the *Federal Rules of Civil Procedure*, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56).  The movant can meet this burden by presenting evidence demonstrating there is no dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Id*. at 322–23.  Only disputes about material facts will preclude the granting of summary judgment.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249

(1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).  Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must

be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 249-50).

A reviewing court is constrained during summary judgment proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citations and quotations omitted) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992).

Cross-motions for summary judgment do not affect the applicable Rule 56 standard. *See, e.g., Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005); *Gerling Global Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). "Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.

1984) (citation omitted).  "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Muzzy Prods., Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002).

The Court has carefully reviewed the applicable law and reviewed and considered the entire record, including the pleadings, the parties' briefs, the evidence submitted in support of the briefs, the arguments made in the briefs, and the arguments of counsel made at the hearing on February 26, 2020.  For the reasons that follow, as to Woods' federal claims, the State's motion for summary judgment is due to be GRANTED, and Woods' motion for summary judgment is due to be DENIED, and the Court will decline to exercise supplemental jurisdiction over Woods' state law claims.

## IV.  DISCUSSION

### A.    Federal Claims

The Court addresses each of Woods' federal claims but not in the order in which they are alleged in the complaint.

#### 1.  Fourteenth Amendment Equal Protection Claims

Woods claims that his right to equal protection has been violated in two ways by the State.  He contends that the State has violated equal protection by setting his execution date while other inmates with exhausted appeals who elected nitrogen hypoxia as their method of execution have not had their execution dates set.  Woods also contends that the State violated equal protection by treating him differently from the plaintiff-inmates in the *In re: Alabama Lethal Injection Protocol Litigation.*

14

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1989).  To establish an equal protection claim, Woods must show that the State has treated or will treat him differently from other similarly situated persons and that such treatment interferes with a fundamental right, discriminates against a suspect class, or is not rationally related to a legitimate government interest.  *Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012) (internal citations omitted).  A classification not involving fundamental rights or discriminating against a suspect class "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1325 (11th Cir.), *cert. denied sub nom. Price v. Dunn*, 139 S. Ct. 1542 (2019).

*Price* arose from facts similar to those in this case in that inmates were given a thirty-day period in which to elect nitrogen hypoxia as a method of execution, but the *Price* plaintiff did not so-elect.  920 F.3d at 1323-24.  There, the plaintiff subsequently brought a claim for violation of equal protection based on the theory that he was treated differently from inmates who were allowed to elect nitrogen hypoxia as a method of execution because their election was timely.  The Eleventh Circuit concluded that the plaintiff had not shown that he was similarly situated to inmates who made a timely election of nitrogen hypoxia, and also that even if he was similarly situated to other inmates, he could not show that he was treated differently because every inmate had the same period of time in which to make the election.  *Id.* at 1324-25.  The court expressly held that "[b]ecause Price did not timely

15

elect the new protocol, he is not similarly situated in all material respects to the inmates who did make such an election within the thirty-day timeframe." *Id.* at 1325.  The court noted that the plaintiff did not contend that he did not receive an election form or was not given the option to make the same election.  *Id.* at 1324.  The court reasoned that while the plaintiff took issue with the fact that most of the inmates who elected nitrogen hypoxia were represented by the Federal Defender's Office, Price also was represented by counsel and that actions by the Federal Defender's Office were not actions of the State.  *Id.*  The Eleventh Circuit further held that a rational basis existed for the thirty-day election period; namely, the efficient and orderly use of state resources in planning and preparing for executions.  *Id.* at 1325.

In this case, the State characterizes the two groups of death-sentenced inmates in Alabama as those who elected nitrogen hypoxia and those who did not.  It is apparently undisputed that the State had a custom of moving for executions when an inmate's appeals are exhausted and now continues to schedule executions when an inmate's appeals are exhausted, but does not move for an execution date for an inmate at this time if the inmate elected nitrogen hypoxia as the method of execution.  (Doc. 32 at 53).  The State explains that the ADOC cannot, at this time, execute inmates who elected nitrogen hypoxia because there is no finalized protocol for that method of execution, but can execute by lethal injection those inmates who did not timely elect nitrogen hypoxia.

Woods argues that the facts regarding the setting of execution dates distinguish this case from *Price* because the *Price* court did not have before it the State's custom to schedule executions based on whether the inmate had chosen nitrogen hypoxia.  Woods'

position is that the additional consideration of the election of nitrogen hypoxia in moving for an execution date cannot be relied on by the State as a material difference among the inmates because he is challenging that very consideration.

As noted, the Eleventh Circuit held in *Price* that inmates who elected nitrogen hypoxia are not similarly situated to inmates who did not so-elect. *Id.* For purposes of the State's scheduling of Woods' execution, the *Price* court's holding means that Woods, who did not elect nitrogen hypoxia, is not similarly situated in all material respects to inmates who elected nitrogen hypoxia. The additional fact of exhaustion of appeals, which Woods and an inmate who elected nitrogen hypoxia may have in common, does not remove the material difference recognized in *Price* of timely election, or non-election, of nitrogen hypoxia for purposes of State action in carrying out executions. *Id.* at 1325. Therefore, Woods, as an inmate who did not elect nitrogen hypoxia and whose appeals are exhausted, is not similarly situated to inmates who did timely elect nitrogen hypoxia and whose appeals are exhausted. *Id.* Under *Price*, therefore, on this aspect of Woods' claim, the State's motion for summary judgment is due to be GRANTED, and Woods' motion is due to be DENIED.

Alternatively, the State is entitled to summary judgment on this aspect of the equal protection claim under rational basis analysis. *See Price*, 920 F.3d at 1325 (holding that the rational basis for the thirty-day election rule is the efficient and orderly use of state resources in planning and preparing for executions).

Woods contends that strict scrutiny is the appropriate standard to apply because fundamental rights to life, notice, and to be free from cruel and unusual punishment are

implicated.  (Doc. 22 at 23).  Woods cites to cases recognizing that strict scrutiny applies when a fundamental right is involved.  Woods also cites *Arthur*, 674 F.3d at 1257, in which the court explained that a significant deviation from a state's execution protocol by failing to perform a consciousness check implicated the equal protection clause.

Woods' claim challenges the State's custom of setting executions of inmates by considering whether appeals have been exhausted and also considering whether the inmate elected nitrogen hypoxia as a method of execution.  The claim is a challenge to the State's criterion of timely election of nitrogen hypoxia, which is like the thirty-day criterion challenged in *Price*.  Because Woods' claim is like the challenge in *Price*, where the Eleventh Circuit applied the rational basis standard, and is distinguishable from the deviation from the execution protocols as in *Arthur*, the Court concludes that the rational basis standard applies.  The Court further concludes that the rational basis test is met by the State's interest, articulated at oral argument and in brief, (doc. 19 at 53-54; doc. 32 at 50), in carrying out executions required by state law as expeditiously and fiscally responsible as possible.  *See Price*, 920 F.3d at 1325.  As to this aspect of Woods' claim, the State's motion for summary judgment is due to be GRANTED, and Woods' motion for summary judgment is due to be DENIED.

Woods' other equal protection theory rests upon his contention that he was treated differently from the inmates in *In re:  Alabama Lethal Injection Protocol Litigation* because he was not given the same State-facilitated access to counsel during the election period as they were given.  Woods argues that this is contrary to U.S. Supreme Court precedent holding that different treatment of inmates who have committed the same quality

18

of offense is unconstitutional, citing *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942).

There is no evidence before the Court that the plaintiffs in *In re: Alabama Lethal Injection Protocol Litigation* had State-facilitated access to counsel during the election period, and there is no evidence that Woods did not have access to counsel during the election period. [10]  Because the case is pending on cross-motions for summary judgment and, as the plaintiff, Woods bears the burden of establishing the elements of his claims, the Court turns to the factual basis of Woods' claim.

Woods cites to an article from *The Montgomery Advertiser* newspaper as evidence that the State made an exception to its rules and facilitated the provision of legal advice by allowing attorneys from the Federal Defender's Office to meet with their protocol litigation clients as a group.  (Doc. 22 at 22; Doc. 22-1).  This Court does not consider the newspaper account relied on by Woods as persuasive evidence of State action to facilitate legal advice. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (the court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'").  Even considering the hearsay statements within the article, however, the article only states that Attorney John Palombi of the Federal Defender's Office said that he got into Holman

---

[10]   While Woods has argued that the State made this concession and is now attempting to retract that concession, that is not apparent to the Court.  In summarizing Woods' claim in their briefs, the State notes that Woods claims that attorneys from the Federal Defender's Office were allowed to meet with the protocol litigation plaintiffs, (doc. 25 at 12), and that Woods stated in the complaint that there were judicially-created opportunities to confer with counsel (doc. 19 at 33 n.122), but the State does not concede those points and instead consistently takes the position that Woods could have conferred with his counsel, and the failure to do so lies with him. (Doc. 25 at 12; Doc. 32 at 47).

prison to see clients on June 26, 2018 and was able to meet with federal defender clients at Donaldson prison on June 29, 2018.  (Doc. 22-1 at 3).  This does not create a question of fact as to whether the plaintiffs in the protocol litigation had an unusual opportunity, facilitated by the State, to confer with counsel about nitrogen hypoxia.

Woods also provides the Court with an affidavit from John Palombi filed in the *Price* litigation.  In that affidavit, Palombi states that between June 5, 2018 and June 25, 2018, he had discussions with the Alabama Attorney General's Office about how to resolve the litigation regarding the three-drug sequence.  (Doc. 22-3 at 2).  He states that on June 26, 2018, at Holman Prison, he met with the consolidated protocol litigation plaintiffs and other inmates he was representing.  (*Id.*).  He does not state that this meeting was facilitated by the State or was a departure from any prison rules.

Finally, at oral argument on the pending motions, counsel for Woods referred the Court to allegations of the complaint, and the reference to those allegations in his brief, to support his argument that the State facilitated access to attorneys.  (Doc. 32 at 78).  Rule 56 of the *Federal Rules of Civil Procedure* requires the nonmoving party, which bears the burden of proof at trial, to go "beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.  The State alternatively moved for summary judgment on the basis that Woods could not prove the elements of an equal protection claim.  (Doc. 19 at 53).  The State, therefore, put at issue Woods' ability to establish that he was denied the same access to an attorney that was enjoyed by clients of the Federal Defender's Office, and the allegations of the complaint

20

are not sufficient to create an issue of fact on that point.  *Celotex*, 477 U.S. at 323; *see also*
*A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.,* 900 F.3d 1270, 1289
(11th Cir. 2018) ("The nonmoving party may not rest upon the mere allegations or denials
of his pleading.") (quoting *Anderson*, 477 U.S. at 248).

There is no genuine issue of fact as to whether the State facilitated meetings between
certain inmates and their attorneys in order for those attorneys to provide information about
the nitrogen hypoxia election.  *See Price*, 920 F.3d at 1324 (noting that interaction between
the Federal Defender's Office and its clients was not State action).  Before the Court,
instead, are the undisputed facts that Woods was represented by, and was not prevented by
the State from conferring with, counsel.  During oral argument, counsel for Woods
intimated that an attorney meeting with a group of inmate-clients was a deviation from
prison rules.  (Doc. 32 at 73-74).  Even assuming that there is a question of fact as to that
specific departure from the prison rules,[11] such question would not be of a material fact,
because the mere fact that an attorney met with multiple clients would not undermine the
undisputed fact that Woods also had access to his own attorney.  As in *Price*, Woods could
have asked for an explanation from his attorney of the election form.  Therefore, even
accepting as fact that the attorneys of the Federal Defender's Office met with multiple
clients at the prison while attempting to resolve the three-drug protocol litigation, because
it is undisputed that Woods also could have consulted with his attorney, there is no genuine

---

[11]  In the newspaper article provided by Woods, an interviewed inmate seems to indicate that the attorneys
actually spoke to their clients one-by-one by stating that the attorneys would move from one inmate to
another inmate to explain the choice. (Doc. 22-1 at 2).

issue of fact as to whether Woods was treated differently *through State action* from other inmates in the disclosure of information about nitrogen hypoxia.

Accordingly, as to this aspect of his equal protection claim, the State's motion for summary judgment is due to be GRANTED, and Woods' motion is due to be DENIED.

### 2.  Fourteenth Amendment Procedural Due Process Claims

Woods asserts that the State violated his right to procedural due process by failing to provide him constitutionally adequate process during the nitrogen hypoxia election period, and specifically, when it presented him with the nitrogen hypoxia election form drafted by the Federal Defender's Office.  Woods elaborates, contending that "[t]he State of Alabama suppressed vital information bearing upon the timing of his execution and failed to provide [him] a meaningful opportunity to consult with his attorney."  (Doc. 22 at 10).

The Fourteenth Amendment of the United States Constitution prevents states from depriving "any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV, § 1.  "The Due Process Clause provides two different kinds of constitutional protections: procedural due process and substantive due process." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013) (citations omitted).  Encompassed within the protections of procedural due process is a "guarantee of fair procedure." *J.R. v. Hanson*, 803 F.3d 1315, 1320 (11th Cir. 2015) (citation and quotations omitted).  Here, Woods brings a procedural due process claim as part of his § 1983 suit.  *See McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (*en banc*) (holding that a violation of procedural due process "may form the basis for a suit under section 1983.").

In the Eleventh Circuit, "a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

While the *Grayden* test is an appropriate avenue by which to analyze Woods' procedural due process claims, both parties analyze his claims under the framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976).[12]  The Court does not need to make a legal determination about which test applies because Woods' claims fail under both.  Because there is some overlap in these analyses, the Court turns first to the *Mathews* test.

Under the *Mathews* balancing test, courts weigh three factors to determine "the specific dictates of due process":

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

[12] While Woods relies on *Mathews* as the appropriate test, the State provides analysis of Woods' claims under both *Grayden* and *Mathews*. (Doc. 31 at 24-27).  The Court is not convinced that the *Mathews* three-part balancing test provides the appropriate lens through which to evaluate Woods' claim.  *See Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015) (describing the plaintiff's reliance on *Mathews* "inapt" because "[a] prisoner's assertion of necessity – that [the State] must disclose its protocol so he can challenge its conformity with the Eighth Amendment – does not substitute for the identification of a cognizable liberty interest." (citation omitted)); *Jones v. Comm'r, Ga. Dep't of Corr.*, 812 F.3d 923, 925-26 (11th Cir. 2016) (Marcus, J., concurring in denial of rehearing *en banc*) (declining to apply the *Mathews* balancing test to the plaintiff's method-of-execution claim because he failed to identify any liberty interest "placed in jeopardy" by the defendant).

*Mathews*, 424 U.S. at 335.

Woods points to three interests that he claims were implicated by the State's actions during the election period: (1) his "residual life interest"; (2) his interest under the Eighth Amendment to free from an "excruciating death"; and (3) his interest in selecting his method of execution. (Doc. 22 at 10). The Court addresses each of these identified interests in turn, as well as a liberty interest.

> a. *Life Interest*

When evaluating Woods' claimed life interest, a case from the Eighth Circuit, *Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015), proves instructive. In *Zink*, several death row inmates challenged the lethal-injection protocol of the Missouri Department of Corrections. The plaintiffs alleged, among other things, "that the defendants [had] deprived them of due process under the United States Constitution by not providing timely and adequate notice of the lethal injection methods." *Id*. at 1096. The Missouri District Court dismissed the plaintiffs' complaint in its entirety for failure to state claim. *Id*. at 1097.

On appeal to the Eighth Circuit, the plaintiffs raised a new argument – "that their life interest entitles them to notice of material information about the lethal drug with which they will be executed." *Id*. at 1108. Specifically, the plaintiffs relied "on the procedural due process decision of *Mathews* . . . , and urge[d] that the private interests served by disclosure and the risk of an erroneous deprivation of rights without disclosure outweigh[ed] the State's interest in avoiding disclosure of details about the lethal drug and its provenance." *Id*. at 1109 (citation omitted).

24

Because the plaintiffs did not develop their *Mathews* procedural due process argument in the District Court, the Eighth Circuit held it was "too late to raise it for the first time on appeal." *Id*. However, the court went on to note that *Mathews* did not apply and that "[t]he prisoners in this case already have received due process for the deprivation of their life interest: They were convicted and sentenced to death after a trial . . . , and their convictions and sentences were upheld on appeal." *Id*.

Here, as in *Zink*, Woods has received all the process that he is due for the deprivation of his life interest:  he was convicted and sentenced to death after a trial in state court, and his conviction and sentence were upheld on appeal.  In fact, Woods received additional process when, under the undisputed facts, he filed an opposition to the Alabama Attorney General's  motion to set his execution date, and when he petitioned the Alabama Supreme Court to temporarily stay his execution.  (Doc. 1 ⁋ 33; Doc. 29 at 3; Doc. 32 at 37). Accordingly, the Court concludes that Woods has failed to establish a life interest for which he has not already received adequate process.

### b. Eighth Amendment Interest

Woods argues that "the State's actions affected [his] Eighth Amendment right to be free from an excruciating death." (Doc. 22 at 10).  To be sure, the Eighth Amendment protects Woods "from the deliberate infliction of unnecessary pain during his execution." *Jones v. Comm'r, Ga. Dep't of Corr.*, 812 F.3d 913, 926 (11th Cir. 2016).  However, Woods has put forth no evidence demonstrating that Alabama's "lethal injection protocol creates a demonstrated risk of severe pain" or that nitrogen hypoxia "significantly reduces a substantial risk of serious pain." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).  Absent

25

this evidence, and for the reasons set forth more fully in Section IV(A)(3), Woods has failed to establish that the State's actions affected his rights under the Eighth Amendment.

### c. Interest in Election

Woods also contends that "the State's actions affected [his] interest in exercising his right to choose the manner of his execution," thus giving rise to a procedural due process violation. (Doc. 22 at 10). In other words, because "Alabama permitted inmates like [Woods] to elect death by nitrogen hypoxia," it created "an interest in that choice." (*Id*. at 11).

Alabama Code § 15-18-82.1(a) provides that "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution or nitrogen hypoxia." Moreover, "[a] person convicted and sentenced to death . . . shall have one opportunity to elect that his or her death sentence be executed by electrocution or nitrogen hypoxia." ALA. CODE § 15-18-82.1(b). If a certificate of judgment pursuant to a decision by the Alabama Supreme Court affirming the death sentence was issued before June 1, 2018, as was the case for Woods, his election must have been made and delivered to the warden within thirty days of June 1, 2018.

As demonstrated by its plain language, the statute does not confer on Woods any interest other than the opportunity to make an affirmative election of death by nitrogen hypoxia or electrocution, in writing, within the thirty-day window that the Alabama Legislature prescribed. It is undisputed that Woods failed to make a timely election; in fact, during the election period, according to Woods, he refused to participate in the

election process at all.  Thus, the Court finds that any interest Woods possessed in making an election concerning his method of execution ceased once the election period ended.

> ### d. Liberty Interest

To the extent that Woods asserts that the State's failure to disclose that it did not have a nitrogen hypoxia protocol during the election period deprived him of a liberty interest, his argument fails.  Notably, the Eleventh Circuit has held that death row inmates do not have a due process right to disclosure of a state's execution protocol because there is no cognizable liberty interest in such information.  *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016) (rejecting the plaintiff's claim that Georgia's Lethal Injection Secrecy Act deprived him of his due process rights because he failed to identify "any cognizable liberty interest infringed by the Georgia secrecy law."); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014) (holding "[n]either the Fifth, Fourteenth, or First Amendments afford [the plaintiff] the broad right to know where, how, and by whom the lethal injection drugs will be manufactured." (quotations and citation omitted)).

This is consistent with decisions from the Fifth and Eighth Circuits.  *See Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (holding that the plaintiff did not have a due process right to disclosure of the state's execution protocol because "uncertainty as to the method of execution is not a cognizable liberty interest."); *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on [the inmate] by withholding the details of its execution protocol."); *Zink*, 783 F.3d at 1109 (agreeing with the Fifth and Eleventh Circuits

that "[a] prisoner's assertion of necessity – that [the State] must disclose its protocol so he can challenge its conformity with the Eighth Amendment – does not substitute for the identification of a cognizable liberty interest." (quotations and citation omitted)).

The plaintiffs in these cases sought the *details* surrounding *existing* execution protocols, while Woods argues here that the State should have disclosed, among other things, the *absence* of a nitrogen hypoxia protocol during the thirty-day election period. (Doc. 22 at 12).  However, it stands to reason that if death row inmates do not possess a cognizable liberty interest in obtaining the details of a given execution protocol, then they do not possess a liberty interest in knowing—for the purpose of electing a method of execution—whether a given execution protocol exists at all.  Further, Woods has not pointed to any authority recognizing the novel procedural due process argument that he advances.  Thus, the Court concludes that Woods has failed to identify a cognizable liberty interest of which he has been deprived.

### e. Government Interest

Regarding the government interest, the State "has 'a strong interest in the finality of the criminal judgments and in seeing lawfully imposed sentences carried out in a timely manner.'" *Ledford v. Comm'r, Ga. Dep't of Corr.*, 856 F.3d 1312, 1319 (11th Cir. 2017). Indeed, "the Constitution affords a measure of deference to a State's choice of execution procedures and does not authorize courts to serve as boards of inquiry charged with determining best practices for executions." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (citations and quotations omitted).  Recognizing Alabama's interest in this case

28

affords respect to its "strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

Woods has failed to identify a private or liberty interest adversely affected by official action for which he has not already received adequate process. Because Woods fails to identify a private interest, there is no risk of erroneous deprivation of said interest. Further, the State has articulated a valid government interest in enforcing criminal judgments in a timely manner. For the reasons set forth under the *Mathews* analysis, Woods is not entitled to any further process other than that he has already received. This alone defeats his procedural due process claim under *Mathews*.

Woods fares no better under *Grayden* because not only does he fail to demonstrate a deprivation of a constitutionally-protected liberty interest, he also cannot demonstrate constitutionally inadequate process. Woods contends that the State deprived him of constitutionally adequate process in several ways during the election period. First, he argues that "[t]he State deprived [him] of vital information necessary to make a knowing and informed decision surrounding his execution." (Doc. 22 at 11). According to Woods, such vital information included the fact that the State did not have a nitrogen hypoxia protocol in place during the election period and that Woods' refusal to "participate in a process that required him to select how he would prefer to be killed . . . would target him for speedier execution." (*Id*. at 12). Moreover, Woods asserts that "without this information, . . . [he] did not understand that his election (or non-election) would impact the timing of his execution" nor did he understand "that, depending on what method of execution he 'chose,' [the State] would either indefinitely spare his life or arbitrarily . . .

schedule his death."  (*Id*. at 11).  In fact, Woods contends that the State "*actively withheld*"

this information from him by not disclosing it on the election form distributed in June 2018.

(*Id*. at 12) (emphasis in original).  Woods further argues that "he was entitled to attorney

access to assist in making an informed decision, which would allow him to understand the

implications of any decision (or indecision)."  (*Id*.).

Here, as with the equal protection claim discussed above, in examining the State's

due process disclosure obligations, the Eleventh Circuit's analysis in *Price* provides

guidance.  *See Price*, 920 F.3d at 1317.  In *Price,* the plaintiff alleged that Alabama's three

drug protocol violated the Eighth Amendment's ban on cruel and unusual punishment and

that the State violated his equal protection rights by refusing to allow him to elect nitrogen

hypoxia as his method of execution after the June 30, 2018 deadline had passed.  *Id*. at

1322.  Regarding his equal protection claim, the plaintiff argued, among other things, that

the State failed to adequately explain his rights when it distributed the election form.  *Id*.

at 1324.  Moreover, the plaintiff took "issue with the fact that most of the inmates that

timely elected nitrogen were represented by the Federal Public Defender's Office and that

they were given an explanation of their rights by that office before receiving the form." *Id*.

The Eleventh Circuit rejected the plaintiff's arguments, emphasizing that he "was

represented by counsel when the State added nitrogen hypoxia as a method of execution

. . ., any doubts [he] had about the [election] form could have been resolved by consulting

with his attorney . . ., [and] he could have asked for an explanation of the form [from his

attorney]."  *Id*.  Thus, the court held "the interactions between other inmates and the Federal

Public Defender's Office do not support any unequal treatment by *the State* of similarly situated individuals." *Id*. (emphasis in original).

Although *Price* involved an equal protection claim, its reasoning is persuasive when applied to Woods' procedural due process claim. Like the plaintiff in *Price*, Woods was represented by counsel on March 22, 2018 when the Governor of Alabama signed into law an amendment to the state's execution statute adding nitrogen hypoxia as an alterative method of execution. He was represented by counsel on June 1, 2018 when the law became effective. He was represented by counsel during the entirety of the thirty-day election period. And like the *Price* plaintiff, Woods could have contacted his attorney to discuss doubts about or seek explanation of the election form or the implications of the election. Indeed, Woods' attorney could have reached out to him to inform him of his rights under the newly passed election statute and resolve any issues surrounding the election form.

Because no communication occurred between Woods and his attorney, Woods now argues that it was the State's obligation, under due process considerations, to provide him with the "vital information necessary to make a knowing and informed decision surrounding his execution." (Doc. 22 at 11). However, any explanation of rights or legal consultation should have come from Woods' attorney, not the State. *See Price v. Dunn*, 385 F. Supp. 3d 1215, 1229 (S.D. Ala. 2019) (finding that the plaintiff "fail[ed] to state an equal protection claim based on the assertion that he did not receive an adequate explanation of his rights in conjunction with receiving the waiver form.").

Moreover, Woods' argument incorrectly assumes that the State possessed, during the thirty-day election period, the information he says was vitally necessary for him to

make a knowing and informed decision concerning his method of execution, namely, the full implications of making the election.  Specifically, Woods asserts that the State should have disclosed not only that it did not have a protocol for nitrogen hypoxia in place during the election period, but also that if Woods "refused to participate in a process that required him to select how he would be preferred to be killed, the Alabama Attorney General would target him for speedier execution." (Doc. 22 at 12).  Stated differently, Woods contends that the State should have disclosed to him during the election period that it did not have a nitrogen hypoxia protocol, and that it would continue to execute inmates using the lethal injection protocol.

However, for Woods' allegation to give rise to an arguably actionable procedural due process claim, the State also would have had to know in June of 2018:  the date upon which Woods would exhaust his appeal rights; that Alabama's lethal injection protocol would still be a viable method of execution when Woods exhausted his appeal rights; and that a protocol for nitrogen hypoxia would not be in place when he exhausted his appeal rights.  This amounts to speculation, not knowledge.

Contrary to Woods' assertions that this information was known to the State during the election period, in fact, it is only now known with the benefit of hindsight. The State could not have known that Woods' election would affect the timing of his execution because it did not know when Woods would exhaust his appeal rights, or that Woods' appeals would be unsuccessful.  If Woods unsuccessfully exhausted his appeal rights *after* the State developed a nitrogen hypoxia protocol, then we would not be here today.  And the State represented during oral argument and in its briefing that it is "diligently working

to formulate a safe hypoxia protocol." (Doc. 19 at 7; Doc. 32 at 44). Woods has offered no evidence to the contrary.

Moreover, during the election period and well into 2019, the lethal injection protocol used in Alabama and in other states, was the subject of legal challenges, thus casting doubt on whether lethal injection would remain, at some point in the future, a viable option to carry out death sentences. *See Bucklew*, 139 S. Ct. at 1133-34; *Price*, 920 F.3d at 1330-31. If any court had held that the lethal injection protocols at issue were unconstitutional, then we would not be here today. These unpredictable, intervening actions demonstrate that the disclosures Woods argues the State should have made to avoid a procedural due process violation were unknowable to the State during the election period. As a matter of logic, the State does not have a due process obligation to disclose information that it does not, and cannot, reasonably know.

Thus, for the reasons stated, the Court concludes that Woods fails to establish any element articulated in *Grayden*. For those same reasons, the *Mathews* factors all weigh in favor of the State. Consequently, neither *Grayden* nor *Mathews* affords Woods any more process than that which he has already received. Accordingly, as to Woods' procedural due process claims, the State's motion for summary judgment is due to be GRANTED, and Woods' motion is due to be DENIED.[13]

---

[13] To the extent that Woods argues that the State violated his procedural due process rights by not providing him the same opportunity to meet with his attorney as other inmates, the Court disagrees for the reasons already discussed in this opinion.

### 3. Eighth Amendment Claims

Woods alleges that he has been "targeted . . . for speedier execution" in violation of the Eighth Amendment, that the ADOC's lethal injection protocol is cruel and unusual, "particularly when there is a known and readily available implemented alternative already adopted by the State," and that lethal injection is "particularly cruel and unusual" because the State will use it "based on" his decision not to elect nitrogen hypoxia.  (Doc. 1 ¶¶ 84-85).

### a. Eighth Amendment Targeting Claim

 Woods claims that simply because he did not elect nitrogen hypoxia, he is being unlawfully "targeted" for a speedier execution than he would have been had he elected nitrogen hypoxia.  Woods also claims that his being scheduled for a lethal injection execution is an "arbitrary and capricious infliction of the death penalty[,]" (doc. 22 at 18), in violation of the Eighth Amendment.

First, as support for his "arbitrary and capricious" argument, Woods relies on Justice O'Connor's concurrence in *Caldwell v. Mississippi*, wherein she states, in relevant part:

> .   .   .   I believe the prosecutor's misleading emphasis on appellate review misinformed the jury concerning the finality of its decision, thereby creating an unacceptable risk that "the death penalty [may have been] meted out arbitrarily or capriciously," *California v. Ramos, supra,* at 999, 103 S. Ct., at 3451, or through "whim . . . or mistake," *Eddings v. Oklahoma,* 455 U.S. 104, 118, 102 S. Ct. 869, 879, 71 L.Ed.2d 1 (1982) (concurring opinion).

472 U.S. 320, 343 (1983).

*Caldwell* concerned the jury's recommendation that the defendant be sentenced to death; it did not concern the method of execution.  The imposition of a death sentence is not synonymous with the State's performance of a court-imposed death sentence.  Woods confuses these two distinctly different acts, and consequently, *Caldwell* provides no support for Woods' argument.  His reliance on *Caldwell* is misplaced, as is his reliance on *Gregg v. Georgia*, 428 U.S. 153 (1976), which also concerned the imposition of a death sentence, not the execution of a death sentence.[14]

Second, Woods' targeting claim is based on several underlying facts, discussed herein, that cannot reasonably be categorized as unconstitutional targeting.

As already noted, when the Alabama Code was amended to add nitrogen hypoxia as a second alternative execution method, the ADOC had yet to develop a protocol for performing nitrogen hypoxia executions.  Until the ADOC has such protocol, the State is unable to execute an inmate by nitrogen hypoxia.

Woods faults the State for failing to disclose, during the election period, that the ADOC had no nitrogen hypoxia protocol at that time, that it could not perform nitrogen hypoxia executions until such protocol had been developed, and that the State intended to continue lethal injection executions.  As the Court has already discussed, the State had no obligation to disclose any information concerning its execution protocols, for electrocution, lethal injection, or nitrogen hypoxia, including the status of its development of a nitrogen

---

[14] In *Gregg*, the U.S. Supreme Court determined that Georgia's death penalty statute was constitutional; holding that the imposition of a death sentence for the crime of murder does not violate the Eighth or Fourteenth Amendments.  428 U.S. at 207.

hypoxia protocol.  Woods concedes that a determination that the State did not improperly withhold information defeats his Eighth Amendment targeting claim.  (Doc. 32 at 36-37).

The evidence also fails to support Woods' targeting claim in any respect.  Instead, the undisputed evidence shows that Woods is not being targeted for execution because he did not elect nitrogen hypoxia.  Rather, the undisputed evidence shows that, on October 29, 2019, the State requested an execution date for Woods because he had exhausted his appeals, and because the State has the means by which to perform lethal injection executions, the default method of execution absent an election of an alternative method. After Woods exhausted his appeals, there was no legal impediment to prohibit the State from moving forward to seek his execution date.  Had Woods elected nitrogen hypoxia, the State, logically, could not have requested an execution date for him because there is no nitrogen hypoxia protocol.  But since Woods did not elect nitrogen hypoxia, he remains subject to execution by Alabama's default execution method, lethal injection.  The State's conduct in seeking Woods' execution date is not constitutionally suspect.  Therefore, on this aspect of Woods' Eighth Amendment claim, the State's motion for summary judgment is due to be GRANTED, and Woods' motion is due to be DENIED.

   *b.  Eighth Amendment Method-of-Execution Claim*[15]

The U.S. Supreme Court's decision in *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015), sets forth the relevant two-pronged standard a plaintiff must meet to succeed on an Eighth Amendment method-of-execution claim.

---

[15]  At oral argument, the State conceded that it waived the affirmative defense of the statute of limitations on this claim. (Doc. 32 at 55).

First, an inmate must establish that the method challenged presents a risk that is "'*sure or very likely* to cause serious illness and needless suffering,' and gives rise to 'sufficiently *imminent* dangers.'" *Id.* (emphasis in original) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality opinion) and quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993)).   In *Baze*, the Court pointed out that the simple fact that "an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual" punishment prohibited by the Eighth Amendment.  *Baze*, 553 U.S. at 50. Thus, an inmate must show a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 135 S. Ct. at 2737 (citing *Baze*, 553 U.S. at 50, quoting *Farmer v. Brennan*, 511 U.S. 825, 846 & n.9 (1994)).

Second, the inmate must also "identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 52).  Where a prisoner claims a safer alternative to the State's lethal-injection protocol, he cannot make a successful challenge by showing a "slightly or marginally safer alternative."   *Glossip,* 135 S. Ct. at 2737 (quoting *Baze,* 553 U.S. at 51).

The Supreme Court recently reconfirmed an inmate's burden in an Eighth Amendment method-of-execution challenge in *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).   There, the Court held that a prisoner "must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial

risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Id.*

The Court examines these two prongs of the *Baze-Glossip* test in reverse order.

> ### i.     whether there is an alternative method of execution

Woods identifies nitrogen hypoxia as his proposed alternative to lethal injection. Regardless of the fact that the State represents that it presently has no nitrogen hypoxia protocol, a prerequisite to performing an execution via nitrogen hypoxia, the Eleventh Circuit has held that because Alabama adopted nitrogen hypoxia as a method of execution in March 2018, that method of execution, as a matter of law, is available to its inmates, *Price*, 920 F.3d at 1328-29, and "that an inmate may satisfy his burden to demonstrate that the method of execution is feasible and readily implemented by pointing to the executing state's official adoption of that method of execution." *Id*. at 1328. Thus, Woods has met his burden on the second prong of the *Baze-Glossip* test.

> ### ii.    whether Alabama's execution protocol entails a substantial
> ###        risk of severe pain

To meet the first prong of the *Baze-Glossip* test, Woods must establish "that [Alabama's] use of a massive dose of midazolam in its execution protocol entails a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2731. Woods has not presented any evidence to support this claim.[16]  When confronted with this evidentiary failure at oral

---

[16] At most, Woods references evidence presented to the district court in *Price*, but he does not provide that evidence to this Court.  (Doc. 29. at 17).

argument, Woods referred the Court to the allegations in his complaint.[17]  (Doc. 32 at 78).

An examination of the allegations in the complaint reveals that Woods claims that

"midazolam is not designed for use as the sole drug in anesthesia, but rather is sometimes

used as a *sedative* prior to inducing anesthesia with a different drug."  (Doc. 1 ⁋ 52)

(emphasis in original).  Woods further alleges:

> Because midazolam is not an anesthetic but rather a sedative,
> its use in an execution—regardless of the dose—does not
> eliminate the risk that an inmate will experience pain from
> either the paralytic or potassium chloride.  On the contrary,
> there is a high likelihood that midazolam will fail to reliably
> facilitate the sustained anesthetic state necessary to prevent an
> inmate from feeling the intolerable pain associated with the
> second and third drugs in Alabama's protocol.

(*Id.* ⁋ 55).

     Next, Woods claims that

> [b]ecause of the way midazolam works in the human body, it
> could sedate an individual to the point where he was incapable
> of communicating that he was in pain while doing nothing to
> suppress the experience of pain.  By contrast, recent studies
> show that nitrogen hypoxia may be a more humane form of
> execution.  *See* Michael Copeland *et al.*, "Nitrogen Induced
> Hypoxia as a Form of Capital Punishment," East Central Univ.,
> available at https://www.documeritcloud.org/document
> /4414097-Nitrogen-Hypoxia.html.

(*Id.* ⁋ 56).

---

[17]  Woods further asks the Court to hold this claim in abeyance to allow for discovery. (Doc. 32 at 31).
Woods did not file any motion, under Rule 56(d) or otherwise, asking the Court to delay a ruling on the
cross-motions for summary judgment in order to conduct discovery.  Woods has not shown any good cause
for  the Court to delay a ruling on this claim, and the Court declines to do so.

While Woods attempts to rely on the allegations of the complaint to satisfy his burden under Rule 56, these bare allegations are not evidence and are insufficient to create a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An allegation of *some* risk alone fails to meet the Supreme Court's high standard; "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50. Indeed, as the U.S. Supreme Court recently noted in *Bucklew*, "the Eighth Amendment does not guarantee a prisoner a painless death – something that, of course, isn't guaranteed to many people, including most victims of capital crimes." 139 S. Ct. at 1124 (referencing *Glossip*, 135 S. Ct. at 2732-33).

Alabama uses the three-drug lethal injection protocol that was at issue in *Glossip*. *See Price v. Dunn*, 385 F. Supp. 3d. 1215, 1221 (S.D. Ala. 2019) (noting that the *Glossip* protocol is "functionally identical to Alabama's"). To date, that protocol examined by the Court in *Glossip* has not been held to violate the Eighth Amendment. Woods has failed to meet his burden to establish this element of the *Baze-Glossip* test; therefore, he has failed to demonstrate that Alabama's lethal injection execution method violates the Eighth Amendment. The State's motion for summary judgment as to Woods' Eighth Amendment method-of-execution claim is due be GRANTED.

**B.    State Law Claims**

Woods raises three state law claims: fraudulent misrepresentation (Count 4), fraudulent suppression (Count 5), and violation of the AAPA (Count 6). Since Woods filed this action pursuant to 42 U.S.C. § 1983, the Court has original jurisdiction over Woods'

federal claims.  In the context of actions filed under this statute, "liability is appropriate solely for violations of federally protected rights." *Almand v. DeKalb County*, 103 F.3d 1510, 1513 (11th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)). Section 1983 does not create any substantive rights; rather, "it merely provides a remedy for deprivations of federal statutory and constitutional rights." *Almand*, 103 F.3d at 1512; *accord Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1265 (11th Cir. 2010).

Given the Court's jurisdiction over Woods' claims arising under § 1983, it has the authority to exercise supplemental jurisdiction over Woods' state law claims.  *See* 28 U.S.C. § 1367(a).  The State acknowledges this authority but submits that this Court should decline to exercise it in this case because the State is entitled to summary judgment on Woods' federal claims.

As set forth herein, judgment is due to be granted to the State on Woods' federal claims.  Where all federal claims are dismissed prior to trial, district courts are encouraged to dismiss any remaining state law claims.  *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004).  Before dismissing the remaining state law claims, the federal court must consider the factors of judicial economy, convenience, fairness, and comity.  *See Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 537 (11th Cir. 2015).

"Both comity and economy are served when issues of state law are resolved by state courts."  *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002).  "Federal courts are (and should be) loath to wade into uncharted waters of state law, and should only do so when absolutely necessary to the disposition of a case."  *Ameritox*, 803 F.3d at 540. Indeed, the Supreme Court has declared that "[n]eedless decisions of state law should be

avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

The Court has considered these factors and determines that it should decline to exercise supplemental jurisdiction over Woods' state law claims. Accordingly, Woods' state law claims will be dismissed without prejudice to his right to pursue them in state court.

## C. Motion to Stay Execution

Woods filed his motion for a stay of execution (doc. 29) on February 24, 2020. The State filed its objection to the motion (doc. 31) on February 25, 2020. Oral argument on the motion was heard on February 26, 2020.

In his motion, Woods largely rearticulates the claims made in his complaint (doc. 1) and the arguments set forth in his motion for summary judgment (doc. 22) and his reply to the State's response to his motion for summary judgment (doc. 30). Woods urges the Court to "maintain the status quo" and issue a stay to allow for resolution of his constitutional and state law claims. Woods argues that because the State "suppressed" information critical to Woods making a "knowing and voluntary . . . decision" (doc. 29 at 8), during the June 2018 election period, he is likely to prevail on the merits of his claims. Woods further argues that denial of a stay would result in irreparable harm -- namely, his execution, while a stay would not injure the State's interests because the State has delayed the executions of inmates who elected nitrogen hypoxia. Woods contends that granting a stay is in the public interest because it will give the Court adequate time to resolve Woods'

"important and timely constitutional challenges" to the State's "discriminatory execution practices . . . ."  (Doc. 29 at 8).

In its opposition, the State objects to the late nature of Woods' motion, calling his last-minute filing a "textbook example of undue delay and gamesmanship in execution litigation."  (Doc. 31 at 4).  The State further argues that Woods has not demonstrated a substantial likelihood of success on the merits of his claims and that the rights of Woods' victims, the interests of the State, and the public interest at large heavily outweigh Woods' request for a stay.  (*Id.*).

While a death row inmate may challenge the constitutionality of his execution through a civil action, a stay "is not available as a matter of right," even if execution is imminent.  *Hill v. McDonough*, 547 U.S. at 584.  Rather, "a stay of execution is an equitable remedy," and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts."  *Id.*; *cf. Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983) ("Each delay, for its span, is a commutation of a death sentence to one of imprisonment.").  Both the State and the victims of crime "have an important interest in the timely enforcement of a sentence."  *Hill*, 547 U.S. at 584.

The standard for granting a stay of execution to a death row inmate is the same as that for granting a temporary restraining order or preliminary injunction.  A "death row inmate is afforded no preferential treatment by his filing of a motion to stay, and all requirements for a stay must be satisfied."  *Powell v. Thomas*, 784 F. Supp. 2d 1270, 1273 (M.D. Ala. 2011), *aff'd*, 641 F.3d 1255 (11th Cir. 2011).  A federal court may issue a stay

of execution only if the inmate demonstrates each of the following elements: (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the stay issues; (3) the threatened injury outweighs the harm the stay would cause the other litigant; and (4) if issued, the stay would not be adverse to the public interest. *Chavez v. Florida SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014); *see also Powell v. Thomas*, 641 F.3d 1255, 1257 (11th Cir. 2011).  The inmate must, "by a clear showing," carry the burden of persuasion on all four requirements. *Hill*, 547 U.S. at 584; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

Moreover, when a motion for a stay of execution is filed on the eve of execution, "the extent to which the inmate has delayed unnecessarily in bringing the claim" must be considered. *Nelson v. Campbell*, 541 U.S. 637, 649 (2004).  A "strong equitable presumption" applies "against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584 (quoting *Nelson*, 541 U.S. at 650); *see also Gomez v. U.S. Dist. Ct. for N. Dist. of Calif.*, 503 U.S. 653, 654 (1992) (per curiam) (noting the "last-minute nature of an application" may warrant the denial of a stay).

The U.S. Supreme Court reiterated the importance of this consideration in several of its recent decisions. *See Dunn v. Ray,* 139 S. Ct. 661 (2019); *see also Bucklew,* 139 S. Ct. at 1134 ; *Dunn v. Price,* 139 S. Ct. at 1312.  Most notably, in *Bucklew,* the Court explicitly directed lower courts to "police carefully" against efforts to use last-minute motions to stay an execution "as tools to interpose unjustified delay."  139 S. Ct. at 1134. The Court further cautioned that "last-minute stays should be the *extreme exception*, not

the norm," and that the "last-minute nature of an application that could have been brought earlier . . . may be grounds for denial of a stay." *Id.* (emphasis added) (internal quotation marks omitted).

Based on the foregoing principles, a stay of execution is not warranted. Woods has not surmounted the "strong equitable presumption" against granting a stay and has engaged in inexcusable delay, which is grounds for this Court to deny equitable relief. *Hill*, 547 U.S. at 584; *see also Gomez,* 503 U.S. at 654*; Long v. Secretary, Dept. of Corr.,* 924 F.3d 1171 (11th Cir. 2019). Woods is scheduled for execution on March 5, 2020. Despite ongoing litigation in this Court when his execution date was set, Woods waited until February 24, 2020—ten days before his scheduled execution—to file his motion for a stay of execution. Woods could have requested a stay in the weeks prior. He could have filed his motion immediately after the Alabama Supreme Court scheduled his execution on January 30, 2020, or contemporaneously with his application to the Alabama Supreme Court on February 7, 2020, or along with his motion for summary judgment in this Court on February 13, 2020, or immediately after the Alabama Supreme Court denied his motion to stay on February 14, 2020. Instead, Woods waited ten additional days after his request to the Alabama Supreme Court was denied, filing his motion to stay the week before his scheduled execution. Woods has not offered, and the Court has not found, a justification for the last-minute nature of his motion. As a result, Woods' motion is due to be denied based on its untimeliness alone.

Despite the last-minute nature of his motion, Woods argues that a stay is warranted to the extent the Court needs adequate time to consider the merits of his claims. As

articulated above, however, this Court has fully considered the merits of Woods' constitutional claims—having resolved those claims in favor of the State—and has declined to exercise supplemental jurisdiction over Woods' state law claims.  As a result, a stay of Woods' execution is unnecessary.

Furthermore, Woods has not met his burden in demonstrating each of the elements he is required to prove before this Court should enter a stay.  *Powell*, 641 F.3d at 1257. Woods cannot show that he has a substantial likelihood of success on the merits of his constitutional claims because he has, in fact, been unsuccessful on the merits of those claims in this Court.  And because this Court has declined to exercise supplemental jurisdiction over his state law claims, Woods likewise cannot establish a substantial likelihood of success on those claims in this Court.  The Court further finds that the State's strong interest in enforcing its criminal judgments and the public interest in seeing capital sentences completed both weigh heavily in favor of denying a stay in this case.

Due to the untimeliness of his motion, the resolution on the merits of his federal claims, the Court's declination to exercise supplemental jurisdiction over the state law claims, and the interests weighing against the grant of a stay, this Court concludes that Woods' motion for a stay of execution (doc. 29) is due to be DENIED.

## V.  CONCLUSION

For the reasons stated above, it is

ORDERED as follows that:

1.     Woods' claims against the Defendants in their individual capacities are

       DISMISSED;

46

2.      the State's motion for summary judgment on Woods' federal claims (doc.

19) is GRANTED;

3.      Woods' cross-motion for summary judgment on his federal claims (doc. 22)

is DENIED;

4.      Woods' state law claims are DISMISSED without prejudice; and

5.      Woods' motion for a stay of execution (doc. 29) is DENIED.

A separate final judgment will be entered in accordance with this order.

Done this the 2nd day of March, 2020.

                                /s/ Emily C. Marks
                        EMILY C. MARKS
                        CHIEF UNITED STATES DISTRICT JUDGE